**NATIONAL EASTERN CORPO-
RATION**

v.

**The UNITED STATES.**

No. 63–71.

United States Court of Claims.

May 11, 1973.

John C. Yavis, Jr., Hartford, Conn., attorney of record, for plaintiff. John S. Murtha, David C. Anderson and Murtha, Cullina, Richter & Pinney, Hartford, Conn., of counsel.

Sheldon J. Wolfe, Washington, D. C., with whom was Asst. Atty. Gen., Harlington Wood, Jr., for defendant.

Before DAVIS, Acting Chief Judge, DURFEE, Senior Judge, and SKELTON, NICHOLAS, KASHIWA, KUNZIG and BENNETT, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT UNDER RULE 163(b) AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case comes before the court on request for review by plaintiff of a recommended decision filed August 16, 1972, by Trial Commissioner Louis Spector, pursuant to Rule 166(c) wherein such facts as are necessary to the decision are set forth. The court has considered the case on the briefs and oral argument of counsel. Since the court agrees with the decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted and plaintiff's petition is dismissed. Defendant's counterclaim is dismissed as moot.

## OPINION OF COMMISSIONER

SPECTOR, Commissioner:

On January 14, 1966, the Government negotiated a unit price contract with plaintiff for five million 20 mm. brass cartridge cases at a total cost of $1,350,000. It is apparent from the record that despite pre-award misgivings as to plaintiff's financial and (to a lesser extent) technical ability to perform, the award was nevertheless made in pursuance of the Government's policy of fostering small business, and its specific policy in this instance of broadening a very narrow procurement base for these shell cases which were urgently needed in Vietnam.

Following difficulties, hereinafter described in greater detail, the Government on June 14 and June 19, 1967, terminated this contract and plaintiff's related "facilities" contract on the grounds of default. The propriety of those terminations under the "Default" clause of the contract is at issue.

Under that provision, should it be determined "for any reason that the Contractor was not in default under the provisions of this clause, or that the default was excusable under the provisions of this clause, the rights and obligations of the parties shall, if the contract contains a clause providing for termination for convenience of the Government, be the same as if the notice of termination had been issued pursuant to such clause." [1]

Under the "Termination for Convenience" clause a contractor is essentially entitled to be reimbursed for its costs up to the date of termination. If, however, a default was not excusable, its costs are not reimbursable, and the contractor may be held liable for the excess costs of reprocurement.

Since one of the excuses for nonperformance relied upon by plaintiff was the Government's decision to withhold, reduce, and finally to suspend payments under a "Progress Payment" clause,[2] in

---

1. A "default" is excusable under this provision "if the failure to perform the contract arises out of causes *beyond the control and without the fault or negligence of the Contractor.* Such causes may include, but are not restricted to, acts of God * * * *acts of the Government in either its sovereign or contractual capacity* * * *." [Emphasis supplied.]

2. "Progress payments shall be made to the Contractor as work progresses, from time to time upon request, in amounts approved by the Contracting Officer upon the following terms and conditions:
   * * * * *

"(c) *Reduction or Suspension.* The Contracting Officer may reduce or suspend progress payments, or liquidate them at a rate higher than the percentage stated in (b) above, or both, whenever he finds upon substantial evidence that the Contractor (i) has failed to comply with any material requirement of this contract, (ii) has so failed to make progress, or is in such unsatisfactory financial condition, as to endanger performance of this contract, (iii) has allocated inventory to this contract substantially exceeding reasonable requirements, (iv) is delinquent in payment of the costs of performance of this contract in the ordinary course of

alleged violation of the regulations[3] governing the administration of that clause, the proper interpretation and application of this provision and its implementing regulations, are also at issue.[4]

Following denial of its claim and appeal by the contracting officer and the Armed Services Board of Contract Appeals (ASBCA or board), plaintiff filed a petition here in two counts. The first asserts that the agency's decision was not entitled to finality under the contract "Disputes" clause,[5] and the second alleges a breach of contract in that its inability to perform "was the direct result of the Government's breach of contract in improperly withholding, suspending and terminating progress payments."

The issues of whether or not the contracting officer acted in conformity with the aforementioned "Progress Payment" clause, its extensive implementing regulations, and the other provisions above-referenced involve their interpretation and proper application and these are issues of law, or at least mixed questions of law and fact "in which the law ingredient is predominant, essential, and in all respects crucial."[6] Their prior determination by the agency is therefore not final and is subject to plenary con-

---

business, (v) has so failed to make progress that the unliquidated progress payments exceed the fair value of the work accomplished on the undelivered portion of this contract, or (vi) is realizing less profit than the estimated profit used for establishing a liquidation percentage in paragraph (b), if that liquidation percentage is less than the percentage stated in paragraph (a)(1)."

3. Armed Services Procurement Regulations introductory paragraph E–524 provides, for example, that:

"In the process of reviewing individual progress payments already existing or hereafter established, action to reduce or slow down progress payments or to increase liquidation rates (unless justified on other grounds, such as overpayments or unsatisfactory performance) should be consistent with contract provisions, and never taken precipitately or arbitrarily. Any such reduction of progress payments on active contracts (other than normal liquidation pursuant to the contract) should be effected only after notice to and discussion with the contractor, and after full exploration of the contractor's financial condition, existing or available credit arrangements, projected cash requirements, effect of progress payment reduction on the contractor's operations, and generally on the equities of the particular situation. Where contract performance is satisfactory, and there is neither overpayment nor anticipated loss, proper progress payments, adequately verified, will be paid promptly when earned and billed in accordance with contract provisions, even though the terms of the particular contract may make the payment discretionary rather than mandatory, and such proper payments will not be held up

or denied because of the contractor's lack of need for the payment. E–510.1(c) and E–510.2(c) provide that progress payments may be suspended or their rate of liquidation may be increased, whenever any of the circumstances there described are found to exist. The rights reserved to the Government by those paragraphs are for the purpose of protecting the interests of the Government, fostering satisfactory contract performance, and guarding against overpayments and losses. Those paragraphs will be administered with these purposes in mind. Action taken pursuant to those paragraphs will be fair and reasonable under the circumstances of particular cases, and supported by substantial evidence. Findings made under those paragraphs will be in writing."

4. Plaintiff seeks recovery of an amount in excess of $500,000 which it claims were costs incurred during performance. In its answer herein, defendant asserts a counter claim in the amount of $177,135.73, made up of $271,509.72 in progress payments allegedly made to plaintiff, plus $25,336.40 worth of brass cups allegedly furnished by the Government, minus $119,710.49 representing the alleged value of certain items of property acquired from plaintiff. Defendant notes in its brief that this net sum of $177,135.73 has already been set off and retained by it under another contract. Since the amount of defendant's counterclaim, plus applicable interest, has been so satisfied, defendant's counterclaim is dismissed.

5. Worded in conformity with 41 U.S.C. §§ 321–322.

6. *See* Ray D. Bolander Co. v. United States, 186 Ct.Cl. 398, 404, 405, 415 (1968).

siteration herein.[7]  As will appear later herein, resolution of these issues is also dispositive of plaintiff's count alleging a breach of contract.

## Statement of Facts

Plaintiff was known as Connecticut Cartridge Corporation when awarded this contract.  It is a small business concern which had no prior experience either as a Government contractor or as a manufacturer of 20 mm. brass cartridge cases.  This item was in critically short supply[8] and large quantities were needed for Vietnam.  The Frankford Arsenal, U.S. Army, requested proposals on September 9, 1965, for a total of 26,300,000.  Plaintiff proposed to supply five million at a unit price of 27 cents.

Prior to award the Government conducted a pre-award survey to determine plaintiff's quality assurance standards and its production and financial capabilities.  The survey disclosed the following:

Quality Assurance capability is presently unsatisfactory.  However, bidder states that he will obtain the necessary inspectors, inspection and test equipment, and institute a quality control system  *  *  *  if awarded this contract.

The production capability has been determined satisfactory by technical representatives of Frankford Arsenal as stated in their letter of 8 Dec. 1965.

Part IV of the survey entitled "Financial Capability," further demonstrated that plaintiff had deficits in both working capital and net worth, but that financing was contemplated by "use of contractor's own resources" and "officer advances."  The use of progress payments, guaranteed loans and advance payments were clearly not intended at that time.

As part of the pre-award survey, Mr. Louis Toffolon, plaintiff's treasurer, sole voting stockholder, and holder of the majority of its stock, submitted a current personal financial statement and a letter dated December 16, 1965, in which he offered to personally guarantee performance of the contract, if necessary.  He also stated his intention of transferring certain real property, plant, and machinery to plaintiff corporation in 1966, as part of the overall capitalization of the corporation.  Since this letter played a critical role in the award of the contract, its contents are worth quoting in full:

Enclosed please find financial statements as requested in your letter of December 14, 1965.

I would like to point out, however, that although Connecticut Cartridge Corporation has been in business for several years, the operation was limited and it was only a year ago that the undersigned became financially interested in the company.  Since that time, I have become the majority stockholder and undertook the responsibility of developing and expanding the company's capacity. · Additional machinery has been purchased and recently installed at the plant worth in excess of $500,000.00.

The realty including the land and buildings were also purchased outright lately.  Neither the machinery or the realty appear on the corporation's financial statement.  In order to facilitate legal and accounting requirements it was thought best to include the capitalization of these items on the company records commencing with the new year.

The above items have substantially increased the company's capabilities for production and should presently be

7. See Paccon, Inc. v. United States, 399 F.2d 162, 168–169, 185 Ct.Cl. 24, 35 (1968) ; also, J. W. Bateson Co. v. United States, 450 F.2d 896, 196 Ct.Cl. 531 (1971), and Baldwin-Lima-Hamilton Corp. v. United States, 434 F.2d 1371, 193 Ct.Cl. 556 (1970).

8. The Government had only two suppliers of 20 mm. brass cartridge cases and it was actively seeking other sources of supply.

considered as part of the overall capitalization of the company.

In addition to the above, I am willing if necessary, to guarantee personally the performance of the subject contract and I am therefore enclosing a copy of my personal financial statement which illustrates conservatively a personal net worth of $2,215,250.00.

\* \* \*

I will be happy to furnish any additional information which you may require to prove my financial ability to perform the above contract.

The survey report also contained the following additional remarks concerning plaintiff's financial reputation and condition:

Mr. George W. Tripp, Jr., Vice President, Connecticut Bank and Trust Company, West Hartford Branch reports having known the individuals involved in Connecticut Cartridge Corporation and specifically Louis Toffolon, the Treasurer and sole stockholder, for many years. Numerous dealings with affiliated concerns have always been handled in a satisfactory manner. Accounts are held in high regard. Individuals are well thought of.

Bank will loan the corporation $150,000.00 if endorsed by Louis Toffolon personally. Mr. Toffolon states he does not think it will be required.

\* \* \* \* \* \*

\* \* \* Whatever machinery and/or real estate values are incorporated into the corporation in January 1966 will be paid in stock certificates, no notes.

Long term liabilities of $82,352.97 of present balance will be subordinated until completion of contract.

If this R.F.P. [Request for Proposal] becomes a contract, the guarantees,

etc., will be executed, prior to signature.

Based upon the foregoing, the contract was awarded January 14, 1966. Thereunder, plaintiff agreed to deliver 500,000 units in May and June 1966, and one million units per month thereafter until completion in October 1966.

During the early stages of performance in 1966, plaintiff encountered substantial technical difficulties in setting up its production line. As a result it failed to deliver a sample lot for testing and evaluation on or about February 28, 1966. Plaintiff's problems stemmed from its inability to readily secure necessary materials, special equipment, tooling, and competent personnel. In addition, problems were experienced in adapting and modifying existing equipment to meet the new cartridge case dimensions.

On March 21, 1966, plaintiff requested a 3-month extension of time for delivery of the sample lot, and an extension of the production delivery schedule. On that date and on April 14, 1966, it also expressed the need for specific Government-furnished equipment in order to complete its production line. In letter dated April 19, 1966, the Administrative Contracting Officer (hereinafter ACO),[9] advised plaintiff that the Government was considering termination for default. The letter made particular reference to the "lack of positive decisions in regard to obtaining brass cups, equipment, prompt plant expansion, and obtaining operating personnel."

Plaintiff replied on April 28, 1966, outlining the corrective steps it had taken, requesting further adjustments in the delivery schedule, and the negotiation of a so-called "facilities" contract.[10] On May 19, 1966, the ACO advised plaintiff that authority had been granted by the Procuring Contracting Officer

9. Contracting officer responsibilities were divided among individuals according to function. The ACO was in fact employed by another agency, Defense Contract Administration Services District (DCASD) at Hartford, Connecticut.

10. Under which the Government would furnish certain equipment for the contractor's use.

(hereinafter PCO), to revise the delivery schedule of both the sample lots and the production units, and that certain Government-furnished equipment would be made available. Contract modification No. 1 dated June 21, 1966, changed the date of submission of samples for testing and evaluation to September 30, 1966, and extended the first delivery of production quantities from May to October 1966, with deliveries to be completed by May 1967. In consideration of the above adjustments, the contract price was reduced by $10,335.

In June 1966, plaintiff hired an experienced production engineer as its general manager. He later testified at the ASBCA hearing that at the time he joined the company there "just wasn't any production. * * * That's why they hired me." During July and August 1966, the Government also assisted plaintiff by furnishing 10,000 brass cups for use in manufacture of the sample lots. Plaintiff acknowledged this assistance in a letter to the ACO, dated August 30, 1966, in which it was explained that plaintiff had contacted numerous suppliers of 20 mm. brass cups, but had not yet been successful in securing a firm commitment.

. By the fall of 1966 plaintiff was making progress toward production, but was still experiencing difficulty in obtaining essential equipment and materials. When plaintiff failed to meet the extended October 1966 date for initial deliveries, the ACO issued a letter dated November 8, 1966, allowing plaintiff 10 days to show cause why the contract should not be terminated for default. During conferences held in the succeeding 10 days, the Government first learned that the aforementioned Mr.

Louis Toffolon had died intestate on September 7, 1966.

The aforementioned land, plant, and machinery had not been transferred to the corporation as had been indicated in the above-quoted letter of December 16, 1965, and these assets and decedent's stock interests in plaintiff corporation had passed by operation of law to the administrator of his estate. It was further learned in the course of these conferences that Louis Toffolon's personal guarantee of performance offered in that December 16 letter, "if necessary," had never been executed by the decedent.[11] Mr. Norman Toffolon, the decedent's son, had taken charge of the management of the corporation.

Following the death of Louis Toffolon, plaintiff corporation was obliged to seek other sources of working capital. Bank financing had not been contemplated in the pre-award survey, and plaintiff's normal banking source was no longer available since previous loans had been made on the strength of Louis Toffolon's personal endorsement. The gravity of plaintiff's financial condition was evidenced by a preliminary evaluation made at the administrator's request. It disclosed that the corporation had a net worth deficit of approximately $160,000 on or about September 30, 1966.

During the aforementioned conferences in early November 1966, Norman Toffolon requested some form of financial assistance from the Government. Although the record is not entirely clear on this point,[12] he apparently represented that he would take steps to increase plaintiff's net worth, presumably by seeking private sources of financing and by obtaining the heirs' assent to transfer the real property, plant, and machin-

---

11. The PCO testified at the board hearing that the standard form of guarantee had not been requested.

"Q. Was such a guarantee required in this case?
"A. We didn't ask for it.
"Q. It was not asked for?
"A. No, sir.

"Q. Can you tell us why not?
"A. I guess we overlookd it."

12. Norman Toffolon did not testify at the ASBCA hearing. He had suffered a heart attack the previous week and was resting in the intensive care unit of the hospital.

ery from the state to the corporation in exchange for capital stock, as had been promised by the decedent.

Although the estate itself had limited means with which to assist plaintiff, the administrator was successful in obtaining permission from the probate court to advance approximately $40,000 from the estate to the corporation to meet payroll expenses from October 1966 through the early part of February 1967.[13] With the assent of the heirs, plaintiff was also allowed the continued use of the aforementioned real property, plant, and machinery on a deferred rental basis.

Based upon the statements and requests of Norman Toffolon, the above-described actions of the administrator, and a plant inspection report of November 14, 1966, indicating that plaintiff had acquired the necessary expertise and "know-how" to perform the contract, the defendant authorized the addition of the earlier mentioned "Progress Payment" clause to the production contract. The purpose of authorizing progress payments, according to the PCO, was to provide "an interim measure to help Connecticut Cartridge get over the financial straits they were in at the time."

Contract modification No. 2, dated December 12, 1966, which added the "Progress Payment" clause, authorized progress payments of 70 percent of the contractor's total incurred costs up to a maximum of 70 percent of the total contract price. It also contained an agreement by the Government to furnish 40,000 pounds of brass cartridge cups; and a revision in the production schedule to provide for deliveries beginning in December 1966, with a completion date in July 1967. In consideration of the above changes and revisions, the contract price was reduced by $2,000.

On December 12, 1966, plaintiff submitted its request for progress payment No. 1 in the amount of $206,509.72, and it received full payment about 3 days later. Shortly thereafter, a number of events occurred which imperiled plaintiff's already precarious financial condition. The board opinion relates that:

\* \* \* On December 15, 1966, its application for an $800,000 long term loan from the Connecticut Bank and Trust Company was rejected, and in January 1967 attempts to obtain debt financing of the realty and machinery through the Connecticut Industrial Building Commission and the Connecticut Development Credit Corporation encountered difficulties over uncertainties concerning the unity of the ownership interest. In the latter part of January, the Administrator advised that the Estate would no longer be able to contribute funds to enable appellant to meet its payroll, and that the assets held by the Estate could not be transferred to appellant without an adequate cash consideration. \* \* \* [Footnotes omitted.]

During the period December 1966 through January 1967, plaintiff also continued to experience technical difficulty in producing an acceptable sample lot, and it failed to meet its extended December schedule for initial delivery. The January monthly production progress report indicates that a pilot lot was rejected in December 1966, and that a new pilot lot was submitted about January 20, 1967. The January pilot lot passed all test except those for hardness and ballistics, the latter tests not having been conducted. A new partial lot was being prepared for additional testing in February. Notwithstanding plaintiff's failure to meet its revised delivery requirements, the Government provided further technical assistance on January 17, 1967, in the form of a "facilities" contract, making available certain Government-owned production equipment at a monthly rental rate.

13. The source of the $40,000 was another company in which decedent had owned a substantial interest. The company was indebted to Louis Toffolon, and after his death the management repaid the obligation to the estate, which then advanced the funds to plaintiff.

Meanwhile a Small Business consultant to DCASD contacted plaintiff by telephone on or about January 15, 1967, and advised that progress payments might or would be held up pending acceptance of a pilot lot.

On February 2, 1967, a meeting was held at DCASD, attended by Norman Toffolon, and various representatives of the defendant, including the Small Business consultant and the ACO. The purpose of the meeting was to discuss the specific subjects of pilot lot acceptance, progress payments, and financial developments. These topics were thoroughly explored but the record and exhibits do not clearly show whether or not the defendant intended to make further progress payments without satisfactory evidence of plaintiff's resolution of its financial and production problems.

Plaintiff submitted its request for progress payment No. 2 in the amount of $125,731.47 on February 6, 1967. On February 9, 1967, the ACO advised plaintiff that the PCO would not approve the full amount requested, but would authorize a payment sufficient to cover 2 weeks' payroll expenses. This action precipitated a subsequent meeting at the Frankford Arsenal, Philadelphia, Pennsylvania, on February 20, 1967, for the purpose of discussing plaintiff's financial condition, and possible release of the full amount of the second progress payment.

At this meeting plaintiff presented the Government with an unaudited cash flow projection to demonstrate its financial ability to perform the contract. The projection had been prepared by the accounting firm of Arthur Andersen & Company to determine the financial position of the corporation on December 31, 1966, and its projected financial position on December 31, 1967. The validity of the projection depended upon a number of management assumptions, including the successful completion of the contract, and the award of a second contract in the approximate amount of $2,000,000.

As a result of this meeting, the Government representatives agreed to make a reduced progress payment in the amount of $65,000 provided, among other things, that plaintiff prepare and submit by February 27, 1967, a second cash flow projection based upon the existing contract alone. The second cash flow projected was submitted and reviewed by the parties between February 27 and March 2, 1967.

With respect to this review, the board expressed the following opinion:

> * * * As a result of this consideration, it was concluded that a line of credit amounting to some $363,000 would be necessary to finance the purchase of materials not covered by the projected cash flow and that even if the Government continued to make progress payments there would be a cash deficit of $75,000 to $100,000 upon completion of the contract. * * * Furthermore, this projection did not assume acquisition of the realty and machinery from the estate nor any increase in the corporate equity. Nor could appellant have produced sufficient units to meet the accelerated delivery schedule upon which the cash flow was predicated. * * *

> Appellant was also unable to establish that any supplier of brass would extend the credit upon which the projection of material costs was predicated. It was further evident that with a projected cash deficit of the dimensions indicated it would be necessary to operate on a C.O.D. basis with suppliers. The situation was next to impossible to work out. * * * [Footnotes omitted.]

In addition to reviewing the second cash flow projection, the Government explored various alternatives with the heirs, administrator, and outside banking sources, but no financing agreement could be reached. Based upon the above efforts, the financial data contained in the second cash flow projection, and the advice of his financial consultants, the PCO formally notified plaintiff in writ-

ing on March 2, 1967, that further progress payments would be withheld pending the completion of a Government audit, but that partial payments would be resumed if certain property were "made available as security to protect the government's rights under the contract." In this letter the PCO expressed his concern about plaintiff's "insufficient cash flow and inadequate financial stability."

The record and exhibits indicate that at this time the Government considered plaintiff technically capable of proceeding with the contract, although it was suffering from severe financial problems and had not complied with previous sample lot and production delivery schedules. The ACO authorized plaintiff by letter dated March 2, 1967, to proceed with production provided the "deviations occuring [sic] in the initial production samples are corrected." The defects for the most part referred to the failure to comply with certain hardness requirements, as previously mentioned.

On March 3, 1967, the Government provided further assistance in the form of contract modification No. 4 which extended the production schedule to require delivery of 15,000 cartridge cases on April 30, 1967, with completion by January 31, 1968. The Government also agreed to furnish an additional 200,000 to 300,000 pounds of material in the form of brass cups in accordance with specified terms. As consideration for this extension of the delivery schedule, the total contract price was reduced by $2,500.

On March 7, 1967, the contracting officer requested an audit which was completed on March 16, 1967. In describing the results of this audit, the board opinion states:

* * * As adjusted, the audit showed an estimated cash flow deficit of $77,500. It also found there was no cash presently available as working capital, no prospective increase in corporate equity, and that on the basis of data provided by appellant it would incur an estimated loss on the contract of $345,000 or 26% of estimated costs to completion. Estimated costs included some $475,000 in preproduction costs for the period March 1966 through January 1967.

Appellant's general manager and the Government's financial and procurement analyst also felt that management's assumption of a performance period of 35 weeks was unrealistic. In view of appellant's lack of experience in producing cartridge cases, they felt that a performance period of 40 to 42 weeks, as provided for in Modification 4, was more realistic. This would have involved another $75,000 to $100,000 of additional cost. Thus, despite appellant's best efforts at cost reduction, it was apparent that the contract would end up in a serious loss position and that * * * neither material suppliers nor any financial institution would extend a line of credit to permit continued production. As of the middle of March 1967, it was clear that despite the Government's technical and financial assistance, appellant's financial condition was such as to endanger continued performance of the contract. [Footnote omitted.]

By letter dated March 23, 1967, the PCO notified plaintiff that pursuant to the "Progress Payment" clause, further progress payments were suspended based upon "data contained in the audit report recently completed which took into consideration information contained in your letter to the Procuring Contracting Officer dated 16 March 1967. * * * Notwithstanding the audit report, the Government may reconsider reinstatement of Progress Payments if the corporation's net worth is improved so that the Government interests can be protected."

On March 27, 1967, plaintiff dismissed its work force and ceased all operations. At that time it had produced 2,700 of the 15,000 units due in April 1967. The units produced still required testing for ballistic requirements. On April 3, 1967, plaintiff submitted its re-

quest for progress payment No. 3, claiming the unpaid balance of the second progress payment, plus $104,476.96 for work performed in February and March 1967. The ACO denied this request on April 5, 1967, stating that "no evidence has been furnished * * * which would indicate improvement of the corporation's net worth." On April 7, 1967, plaintiff was asked to show cause why the contract should not be terminated for default.

Following further discussions and requests for extensions of time, the production contract was terminated for default June 14, 1967, on two stated grounds: (1) failure to deliver contract items within the time specified without an excusable delay; and (2) continued performance of the contract has been abandoned which was not due to an excusable cause. The related "facilities" contract was terminated June 19, 1967.

### Discussion and Conclusions

By reason of the wording of the "Default" clause [14] the issue in this case is essentially one of proximate cause. Plaintiff, in summary, urges that its inability to perform was ·caused by the death of Louis Toffolon, and the Government's action in withholding, reducing and eventually suspending progress payments contrary to the governing contract clause and regulations. Both of these causes are offered as being "be-yond the control and without the fault or negligence" of plaintiff corporation.

Although it is well settled that the mere financial incapacity of a contractor to perform is not a cause beyond its control and without its fault or negligence,[15] it is equally well established that financial incapacity can be excusable when it was precipitated by causes beyond the control and without the fault or negligence of the contractor.[16] This is *a fortiori* true when the precipitating causes are acts or omissions of the Government, the other contracting party.[17] As a result, and as illustrated by the cited cases, closer issues are presented herein than would at first blush appear.

The record is replete with efforts by the Government to prop up plaintiff's sagging fortunes. These efforts undoubtedly grew out of the long-established Government policy of fostering small business concerns, and its self-interest in broadening the procurement base for this critical item. In retrospect, these rescue efforts were not an unmixed blessing from the standpoint of plaintiff corporation. The efforts it expended and costs it incurred in reliance on that continuing indulgence, served to deepen its losses when the props were eventually removed. There can be little doubt that plaintiff would now be better off had it not been awarded this con-

---

14. *See* note 1 *supra*, and text at that point.

15. *See,* for example, Consolidated Airborne Systems, Inc. v. United States, 348 F.2d 941, 945–946, 172 Ct.Cl. 588, 596–597 (1965); Kennedy v. United States, 164 Ct.Cl. 507, 515 (1964); and Office Equipment Co., ASBCA No. 4648, 58–1 BCA ¶ 1717.

16. *See* Pilcher, Livingston & Wallace, Inc., ASBCA No. 13391, 70–1 BCA ¶ 8331; Coastal Mfg. Co., ASBCA No. 11516, 67–1 BCA ¶ 6378; Douglas Corp., ASBCA Nos. 3349, 3741, 58–1 BCA ¶ 1727; and Paromel Electronics Corp., ASBCA Nos. 4025, 4123, 57–2 BCA ¶ 1503.

17. *See* Litchfield Mfg. Corp. v. United States, 338 F.2d 94, 167 Ct.Cl. 604 (1964); Brooklyn & Queens Screen Mfg.

Co. v. United States, 97 Ct.Cl. 532 (1942); Suburban Contracting Co. v. United States, 76 Ct.Cl. 533 (1932); Pigeon v. United States, 27 Ct.Cl. 167 (1892); United States v. Lennox Metal Mfg. Co., 225 F.2d 302 (2d Cir. 1955); National Radio Co., ASBCA No. 14707, 72–2 BCA ¶ 9486; Pilcher, note 16 *supra*; R.H.J. Corp., ASBCA No. 9922, 66–1 BCA ¶ 5361; U. S. Services Corp., ASBCA Nos. 8291, 8433, 63 BCA ¶ 3703; Q.V.S., Inc., ASBCA No. 3722, 58–2 BCA ¶ 2007; Douglas, note 16 *supra*; George E. Martin & Co., ASBCA No. 3117, 56–2 BCA ¶ 1150. Cf. Preuss v. United States, 412 F.2d 1293, 188 Ct.Cl. 469 (1969); Davis v. United States, 180 Ct.Cl. 20 (1967); and Emsco Screen Pipe Co., ASBCA Nos. 11917, 12184, 69–1 BCA ¶ 7710.

tract, in the face of serious misgivings regarding its ability to perform; and had it not been thereafter indulged with technical and financial support when grounds for termination first developed. Plaintiff in fact urges these factors now as constituting a waiver by the Government, and an estoppel. However, its argument is not persuasive.

Each time the Government's representatives waived a failure to make progress, or to meet a delivery schedule, they substituted a new and reasonable schedule by agreement. It was only when there appeared strong evidence that plaintiff would be unable to meet the last-established completion schedule, that termination action was eventually taken.

Considering chronologically plaintiff's proffered excuses for nonperformance, it states that it would not have been awarded nor would it have accepted this contract but for Louis Toffolon's financial resources and support. This is undoubtedly true. It then urges that "the Government was at fault in failing to accept Mr. Toffolon's offer to guarantee performance of the contract personally." Thus, when he died intestate without having executed a guarantee binding upon his estate, and without having transferred to plaintiff-corporation the capital assets earlier described, his death became the cause of plaintiff's financial difficulties, an event beyond the control and without the fault or negligence of plaintiff.[18]

Although the record demonstrates that Louis Toffolon was closely identified with plaintiff,[19] they were not identical legal persons. Louis Toffolon had agreed in that letter of December 16, 1965, to transfer realty and machinery to plaintiff-corporation at the beginning of the new year, 1966. His death occurred 8 months later than that, Septem-

ber 7, 1966, without the transfer having been made. That factor alone seriously weakened plaintiff's financial position after his death since these substantial assets were not available to plaintiff as a source of commercial credit. The transfer was a matter wholly within the control of the transferor and the plaintiff-transferee, and both were very closely identified with one another during Mr. Toffolon's lifetime.

Similarly, during that 8-month period, the execution of the personal guarantee of performance by Mr. Toffolon was within the control of the guarantor and the plaintiff whose performance was being guaranteed. Admittedly, it would have been preferable had it been requested by Government representatives, since the offer had been made on an "if necessary" basis, and it clearly anticipated a reply or a request. Yet that factor alone did not render the absence of the guarantee a matter beyond the control and without the fault or negligence of plaintiff, within the meaning of the "Default" clause. It could have been executed by the parties on their own initiative, and without an invitation from defendant. It follows, therefore, that Mr. Toffolon's death in September 1966 was not the sole proximate cause of plaintiff's failure to perform.

However, even assuming, *arguendo*, that it was, plaintiff did not cease performance on that ground and at that time. Instead, the parties entered into a new agreement providing for progress payments, a revised delivery schedule, and the furnishing of brass cups by defendant, actions designed to ease the impact of Mr. Toffolon's death upon plaintiff's ability to perform. That earlier misfortune was thereby merged in and superseded by the new agreement. Plaintiff thereafter re-

---

18. Citing *Coastal*, note 16 *supra*.

19. He was, it will be recalled, sole voting stockholder; holder of a large majority of the stock; principal financial support; and principal basis for any outside line of credit. There was, furthermore, no indication of financial distress on the part of plaintiff, prior to Louis Toffolon's death.

ceived progress payments under the new arrangement, and its earlier misfortune was no longer available to it as an excuse for nonperformance.

■ This brings us to plaintiff's second ground for urging that this default termination should be converted to one for the convenience of the Government. It submits that nonperformance resulted from the contracting officer's wrongful withholding, reduction, and eventual suspension of progress payments, contrary to a contract provision and its governing regulations.[20] However, the terms of that clause and those regulations are not absolute. Plaintiff, on this record, failed to meet the conditions necessary to insure continuation of progress payments, and it is concluded as a matter of law that the contracting officer acted upon substantial evidence (within the terms of the pertinent clause), when he determined that plaintiff's financial condition was so unsatisfactory as to endanger contract performance.

Plaintiff maintains that the "initial decision to withhold progress payments was based upon no evidence at all, while subsequent decisions were based upon only incomplete and inconclusive evidence." There is no support for this assertion.

The PCO communicated his initial decision to withhold approval of the full amount of the second progress payment on or about February 6, 1967. At that time, his overriding concern was the financial condition of the corporation. By mid-January or the early part of February defendant's representatives had learned through numerous meetings and correspondence with plaintiff that the estate would no longer be able to advance funds to the corporation; that the heirs had not agreed upon definitive measures to increase the net worth of the corporation; that a long-term loan application had been denied; that debt financing could not be arranged until the uncertainties concerning the unity of ownership interests were resolved; that other efforts to obtain outside private financing had not been successful; and that the assets held by the estate could not be transferred to the corporation without an adequate cash consideration. The evidence amply supported the PCO's concern.

Following this initial decision, the parties held a meeting on February 20, 1967, to discuss plaintiff's financial situation. As a result thereof, and the parties' review of plaintiff's unaudited cash flow projection, defendant agreed (among other things) to make a reduced payment in the amount of $65,000 provided that plaintiff prepare and submit a revised projection based upon the existing contract only. Defendant was dissatisfied with plaintiff's second cash flow projection, and advised plaintiff on March 2, 1967, that its requests for further progress payments would not be granted until the completion of a Government audit. After reviewing the financial data contained in the audit, the contracting officer notified plaintiff in writing on March 23, 1967, that future progress payments would be suspended.

The two cash flow projections, the Government audit report, and the information available through correspondence and numerous conferences with plaintiff, constitute substantial evidence of unsatisfactory financial conditions. The PCO was cognizant thereof and he relied upon these data in reaching his decisions. Furthermore, the detailed evidence outlined earlier demonstrates that defendant complied with the requirements prescribed by the regulations [21] that he discuss and fully explore the "contractor's financial condition, existing or available credit arrangements, projected cash requirements, effect of progress payment reduction on the contractor's operations" and the general equities of the situation.[22]

20. See cases cited in note 17 *supra*.

21. *See* note 3 *supra*.

22. *Cf. Davis*, note 17 *supra*.

Plaintiff also argues that the Government should have considered the actual state of production prior to the suspension of progress payments, rather than limiting its inquiry to financial projections alone. Plaintiff asserts that it was about to commence full production when it was forced to shut down on March 27, 1967, by the suspension of progress payments.

The board's opinion does point out that in March 1967 Government representatives apparently did consider plaintiff technically capable of proceeding with the contract. That is not to say, however, that plaintiff was capable of meeting the amended delivery requirements set forth in the contract. In fact, as late as March 2, 1967, modification No. 4 had been executed to further extend the delivery schedule. Pilot lot samples had been approved, but were still subject to the correction of specific deficiencies. At the time plaintiff ceased its operations in late March, only 2,700 units of the 15,000 required in April, 1967 had been manufactured.

■ This record falls short of demonstrating the existence of an efficient, continuous, operating production line when progress payments were suspended on March 23, 1967. In any event, the status of production does not preclude the contracting officer from suspending payments pursuant to the express provisions on financial condition set forth in the "Progress Payment" clause. The contracting officer notified plaintiff in writing that pursuant to the "Progress Payment" clause, payments would be suspended on the basis of financial data contained in the audit report. This constituted a sufficient "finding" to satisfy the requirements of that clause.

Finally, plaintiff urges that certain of the subordinate findings of fact in the board's opinion are not supported by substantial evidence. It argues that the Government's rejection of its first cash flow projection (which assumed the award of a follow-on contract), was unreasonable. The board found that "a cash flow projection premised on the award of a second contract was unrealistic, in the light of known requirements, the availability of other sources, the demonstrated deficiencies in appellant's performance, and the time-frame of the projection." Plaintiff is taking issue with defendant's evaluation of the projection, the purchase categories therein, and the other sources of supply. But it has failed to demonstrate in light of the facts outlined earlier, that there was no substantial evidence in the record to support the board's finding on this point.

Plaintiff also contends the board improperly found, in plaintiff's words, that the "Government did not impose the condition of pilot lot acceptance upon plaintiff's right to receive further progress payments." Plaintiff is apparently referring to the board's finding that after March 2, 1967, "[t]here is no evidence that the continued withholding of progress payments was due to appellant's inability to produce an acceptable pilot lot."

The purpose of the quoted excerpt was to point out that the decision to suspend progress payments was based entirely upon plaintiff's unsatisfactory financial condition. Earlier in its opinion the board had recognized that plaintiff's difficulty in producing an acceptable sample lot had some influence (in conjunction with the many financial factors), upon the contracting officer's decision to withhold and reduce the second progress payment.

Finally, plaintiff argues that the board erred in making a finding to the effect that "representations were made on plaintiff's behalf that outside financing could or would be obtained." As earlier observed, the record is not entirely clear on this point. But there is evidence to support and sustain a finding regarding Norman Toffolon's representations as to the availability of outside financing, and this issue of fact is in any event not essential to the decision to terminate.

In summary, it is concluded that the board's decision is correct as a matter of law, and that its findings of fact in support of that decision have substantial support in the record.

All of the foregoing considered, it is concluded that plaintiff is not entitled to recover. Plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and the petition is dismissed. The counterclaim is dismissed as moot.