**FLORIDA ENGINEERED CONSTRUCTION PRODUCTS CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 96–200C.

United States Court of Federal Claims.

July 31, 1998.

James S. Ganther, Tampa, FL, for plaintiff.

Franklin E. White, Jr., with who were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, Assistant Director Anthony H. Anikeeff, all of the U.S. Department of Justice, Washington, DC, for defendant.

## OPINION

BRUGGINK, Judge.

Plaintiff Florida Engineered Construction Products Corporation ("Florida Engineered") is assignee under a contract between QMS–EF and the United States by which QMS–EF was to provide wood pallet assemblies. Florida Engineered alleges that the United States breached that contract. Currently pending are the parties' cross-motions for summary judgment. Oral argument was held in Washington, D.C., on August 5, 1997.[1]

## BACKGROUND

The facts of this matter are not substantially in dispute. The contract at issue here was entered by QMS–EF, a Florida corporation and debtor in bankruptcy proceedings before the U.S. Bankruptcy Court in the Middle District of Florida.[2] Plaintiff Florida Engineered was assigned QMS–EF's rights under the contract at issue by the trustee in that bankruptcy proceeding. On September 28, 1994, QMS–EF entered into Contract No. N00164–94–C–0214 with the United States worth $515,824.00 to supply various wood pallet assemblies to the Department of the Navy, Naval Surface Warfare Center, at Crane, Indiana.[3] The contract contained numerous standard contract clauses under the Federal Acquisition Regulation (FAR), including paragraphs 52.249–8 (default), 52.232–16 (progress payments), and 52.242–13 (notice of progress payments).

The agency performed a preaward survey on September 23, 1994, which recommended a complete award of the contract to QMS–EF. The company received satisfactory ratings for technical capability, production capability, quality-assurance capability, and financial capability. With respect to financial capability, the preaward survey states:

BASED ON THE ANALYSIS OF ALL AVAILABLE INFORMATION, AWARD IS RECOMMENDED. QMS WILL HAVE TO MAKE CAPITAL EXPENDITURES IN EXCESS OF $130,000; HOWEVER, THE VENDOR HAS STATED THAT FINANCING IS AVAILABLE. ALTHOUGH THERE IS NO INCOME COMING INTO THE CORPORATION AT THIS TIME, THE CONTRACTOR HAS A NEGATIVE NET WORTH, AND THEIR BANKING ACCOUNT HAS A BALANCE OF $4,500, QMS HAS PROVIDED A LETTER FROM PALM HARBOR LUMBER GIVING THEM A $100,-000 LINE OF OPEN CREDIT AND A LETTER FROM BANKS FINANCIAL CORPORATION ALSO GIVING THEM A $100,000 LINE OF CREDIT. ALSO, PROGRESS PAYMENTS ARE AUTHORIZED.

The preaward survey did not examine QMS–EF's accounting system.

On October 20, 1994, QMS–EF submitted its first request for a progress payment to cover the delivery of materials. On October 24, 1994, the administration of the contract was transferred from the Naval Surface Warfare Center to the Defense Logistics Agency's Defense Contract Management Area Operations in Clearwater, Florida (DCMAO). On October 26, 1994, the administrative contracting officer (ACO) assigned to the contract requested that the Defense Contract Audit Agency (DCAA) audit QMS–EF's accounting system. On November 14, 1994, the DCAA concluded that QMS–EF's accounting system was inadequate to support progress payments, citing an inadequate system of labor charging, an incomplete accounting software package, an inadequate method of allocating indirect costs, and inadequate measures to segregate nonallowable costs. This report was provided to QMS–EF on November 23, 1994, along with a letter requesting that QMS–EF advise the DCMAO when the deficiencies cited in the report had been addressed.

---

1. This matter was reassigned after oral argument. The court has reviewed the transcript of that oral argument.

2. *In re QMS–EF, Inc.*, No. 95–3889–8G1 (Bankr. M.D.Fla.).

3. The contract required the delivery of specified quantities of materials for each of the six contract line items by three separate dates: 135, 165, and 195 days after the contract was entered. The first ship date was to be February 9, 1995. Subsequent shipments were to be made on March 11 and April 10.

Another audit was performed, at QMS–EF's request, and completed on December 15, 1994. This second audit identified five weaknesses in QMS–EF's accounting system, including: inadequate segregation of indirect costs from direct costs, inequitable allocation of indirect costs, inadequate segregation of unallowable pool expenses, inadequate posting of monthly determinations of cost elements, and deficiencies in QMS–EF's labor distribution system. The report was forwarded to QMS–EF on December 28, 1994.

After a third audit, performed sometime in January, DCAA issued a report on January 25, 1995, which found QMS–EF's accounting system "generally adequate" to support progress payments, provided certain conditions were met. As a result, the ACO conditionally approved QMS–EF's accounting system, citing the conditions noted in the DCAA's third audit report.

On January 27, 1995, a pre-progress-payment review was conducted on site at QMS–EF by an agency industrial specialist. The industrial specialist noted that no work had been performed under the contract at that time and that QMS–EF did not intend to commence work until February 2, 1995. On January 31, 1995, the ACO concluded that the contractor was not making sufficient progress and that it would not be able to liquidate progress payments. On that same day, QMS–EF requested an extension of thirty days of the delivery schedule. On February 2, 1995, the agency provided a delivery prioritization to QMS–EF; no extension was granted. The agency specifically stated: "These instructions do not constitute a revision to the contract delivery schedule . . . ." No progress payments were ever made to QMS–EF under the contract.

QMS–EF made partial shipments of the contract requirements on February 13, February 27, and March 6, 1995. On March 8, 1995, the first two shipments were rejected because they did not comply with the specification requirements. The third shipment

was rejected on March 27, 1995, for noncompliance with specifications. A fourth shipment was received from the contractor on April 12, 1995.[4] Plaintiff does not dispute that these shipments did not meet the contract delivery requirements.

On March 16, 1995, the terminating contracting officer (TCO) issued a show-cause letter to QMS–EF, citing the contractor's failure to perform the contract within the time required by its terms. QMS–EF responded to the show-cause letter on March 23, 1995, recounting the entirety of QMS–EF's problems on the contract and citing several reasons for its failure to perform. Those reasons can be summarized as follows: (1) QMS–EF was never contacted concerning a post-award conference or orientation; (2) QMS–EF was never contacted by a small-business specialist; (3) QMS–EF was unable to obtain progress payments under the contract; (4) two milling machines ordered for the contract were nonfunctional when delivered;[5] (5) QMS–EF was able to successfully deliver some of the contract requirements; and (6) the inspection of the delivered materials was inadequate.

The agency, in making its determination to terminate the contract, addressed each of QMS–EF's points in an internal memorandum entitled "Determination to Terminate a Contract for Default," in which the agency outlined the history of the contract and addresses the support for termination. Regarding the post-award conference, the agency stated that QMS–EF never requested one. Regarding the small-business specialist, the agency stated that QMS–EF never requested such advice. Regarding the progress-payment issue, the agency stated:

> [O]n 27 Jan 95 a prepayment review was made. Based on this review, the ACO made the determination that the contractor was not making sufficient progress on the performance of the contract nor did she expect QMS to be able to ship an

4. The fourth shipment was not inspected.

5. Apparently, QMS–EF canceled a previous order for two new milling machines and placed an order for two used milling machines on December 22, 1994. QMS–EF was unable to operate

the machinery when it was delivered on January 21, 1995. According to QMS–EF, the supplier did not provide any further assistance, and QMS–EF had to obtain costly, time-consuming repairs to make the machines operational.

acceptable product that they could invoice against to liquidate the progress payments. With respect to the problems with the milling machines, the agency noted that the purchase of two nonfunctioning milling machines was not its fault. As to the dispute over inspection procedures, the agency noted that QMS–EF was given an opportunity to discuss the procedures with contracting personnel and the agency's inspectors; QMS–EF had not taken that opportunity.

In its memorandum, the agency concluded that, because QMS–EF failed to acknowledge the defects found in the delivered pallets and because it had not proposed to replace or repair the delivered pallets, "there is no indication that [QMS–EF] can manufacture acceptable pallets." Because of the urgent need for the pallets, reprocurement was deemed a faster solution than continuing the relationship with QMS–EF. Furthermore, the agency noted several indications that QMS–EF was insolvent, including the fact that employees of QMS–EF had not been paid for four weeks. The memorandum recommended terminating the contract for default in its entirety.

On April 18, 1995, contract modification P00004 was executed, terminating the contract for default pursuant to FAR paragraph 52.249–8. The notice of termination cited QMS–EF's "failure to meet the required delivery schedule" as the reason for termination. It also stated that the failure was found by the CO to be inexcusable.

In his affidavit, Walter Holmich, president of QMS–EF, recites that, prior to award of the contract, he made the agency aware of QMS–EF's need to receive progress payments under the contract. He also recites that the unavailability of progress payments created a "cash flow crisis" that ultimately led to QMS–EF's filing for bankruptcy.

On April 15, 1996, plaintiff Florida Engineered, having been assigned QMS–EF's

rights under the contract by the bankruptcy trustee, filed its complaint here. It alleges that the government breached the contract with QMS–EF by failing to make progress payments to QMS–EF; "subjecting QMS–EF to a lengthy audit relating to its compliance with cost accounting standards that were inapplicable to QMS–EF"; rejecting shipments of pallets that complied with the contract; rejecting shipments of pallets without properly inspecting those shipments; and wrongfully terminating the contract for default. Plaintiff seeks to have the termination for default converted to a termination for the convenience of the government, thus entitling it to damages under the appropriate contract clause.

The case is currently before the court on the parties' cross-motions for summary judgment. Plaintiff argues that summary judgment in its favor is appropriate because: the agency improperly withheld progress payments that were due QMS–EF under the contract; the government breached its duty to deal in good faith by failing to inform QMS–EF of its intent to delay progress payments; and the agency failed to consider properly QMS–EF's proffered reasons for untimely delivery. The government responds that QMS–EF failed to meet the required delivery schedule; there was no valid excuse for not performing in a timely manner; and the agency fully considered all of QMS–EF's excuses for not performing. The government argues that summary judgment against plaintiff is appropriate because QMS–EF was not entitled to progress payments without first satisfying the contractual requirements.

## DISCUSSION

■ The government is charged with the burden of proving whether a termination for default is justified. *See Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 765 (Fed.Cir.1987).[6] This burden can be satis-

---

6. The contract at issue incorporates the following default provision:

> The government may ... terminate this contract in whole or in part if the Contractor fails to ... [d]eliver the supplies or to perform the services within the time specified in this contract or any extension.... The Government's

> right to terminate ... may be exercised if the Contractor does not cure such failure within 10 days ... after receipt of the notice from the Contracting Officer specifying the failure.... [T]he contractor shall not be liable for any excess costs if the failure to perform the contract arises from causes beyond the control

fied by showing that the contractor failed to perform in accordance with the contract. *See id.* Once the government has satisfied this burden, the contractor is charged with showing that its failure was excusable. *See* 48 C.F.R. ¶ 52.249–8(c); *cf. International Electronics Corp. v. United States,* 227 Ct.Cl. 208, 231, 646 F.2d 496 (1981) (applying similar pre-FAR default-termination clause).

Plaintiff conceded at oral argument that QMS–EF failed to meet the required delivery schedule and thus was technically in default. (*See* Tr. of 8/18/97, at 6.) "The only thing that's at issue ... is whether or not QMS had an excuse for its failure to timely perform." (*Id.*) To thwart defendant's motion for summary judgment plaintiff must, therefore, show that there is a question of material fact as to whether "the failure to perform the contract arises from causes beyond the control and without the fault or negligence of the contractor." *See* 48 C.F.R. ¶ 52.249–8(c); *International Electronics,* 227 Ct.Cl. at 231, 646 F.2d 496.

Plaintiff offers two justifications for QMS–EF's failure to perform: (1) the agency's failure to make progress payments under the contract; and (2) the agency's withholding of information to which it had superior knowledge. Plaintiff also charges the government with prejudicial violations of procedure in connection with the default termination.

## A. *Government's Failure to Make Progress Payments*

 The initial inquiry is whether plaintiff had a contractual right to progress payments. If it did, plaintiff contends that its default can be excused because its financial instability was caused by the agency's failure to make those payments. *See TGC Contracting Corp. v. United States,* 736 F.2d 1512, 1515 (Fed.Cir.1984) (citing *National Eastern Corp. v. United States,* 201 Ct.Cl. 776, 794–96, 477 F.2d 1347 (1973)).

> When ... the contractor claims that his financial inability to perform is due to the government's failure to make the required

progress payments, the burden is on the contractor to establish that the progress payments were erroneously withheld and that the withholding of such progress payments was the primary or controlling cause of the contractor's default.

*Id.* (citing *R.C. Hudson & Assocs., Inc.,* 76–2 B.C.A. (CCH) ¶ 12,201 (1976) and *Guenther Mfg. Co.,* 73–2 B.C.A. (CCH) ¶ 10,327 (1973)).

Plaintiff argues that its failure was excused because the agency improperly withheld progress payments. Defendant contends, first, that plaintiff was not entitled to progress payments unless certain conditions were satisfied, and, second, that plaintiff's default was not caused by the withholding of progress payments.

 When the government fails to make contractually required progress payments, it is in breach. *See Appeal of H.E. & C.F. Blinne Contracting Co.,* 83–1 B.C.A. ¶ 16,388, at 81,480, 1983 WL 7569 (1983) (relying on *Pigeon v. United States,* 27 Ct.Cl. 167 (1892)). In *Blinne Contracting,* relied upon by plaintiff, the contract explicitly stated: "Unless otherwise provided in the specifications, progress payments *will be made* monthly as the work proceeds...." *See id.* at 81,474. Where the contract does not obligate the government to make progress payments, however, plaintiff cannot allege a breach because the government withheld progress payments. *See Appeal of Domco Properties, Inc.,* 69–2 B.C.A. (CCH) ¶ 7862, at 36,550, 1969 WL 691 (ASBCA 1969).

The contract at issue here incorporates two clauses that directly pertain to the use of progress payments. One was the following notice:

> The need for customary progress payments conforming to the regulations in subpart 32.5 of the [FAR] will not be considered as a handicap or adverse factor in the award of the contract. The Progress Payments clause included in this solicitation will be included in any resulting contract.... Even though the clause is in-

and without the fault or negligence of the contractor.... In each instance the failure to perform must be beyond the control and without the fault or negligence of the Contractor.

48 C.F.R. ¶ 52.249–8 (1993).

cluded in the contract, the clause shall be inoperative during any time the contractor's accounting system and controls are determined by the Government to be inadequate for segregation and accumulation of contract costs.

48 C.F.R. ¶ 52.232–13 (1993).

■ The other was the Progress Payments clause, which is specially tailored for small-business concerns. In pertinent part, it states:

Progress payments shall be made to the Contractor when requested as work progresses ... under the following conditions:

. . . .

(c) *Reduction or suspension.* The Contracting Officer may reduce or suspend progress payments, increase the rate of liquidation, or take a combination of these acquisitions, after finding on substantial evidence any of the following conditions:

(1) The Contractor failed to comply with any material requirement of this contract. . . .

(2) Performance of this contract is endangered by the Contractor's (i) failure to make progress or (ii) unsatisfactory financial condition.

(3) Inventory allocated to this contract substantially exceeds reasonable requirements.

(4) The Contractor is delinquent in payment of the costs of performing this contract in the ordinary course of business.

(5) The unliquidated progress payments exceed the fair value of the work accomplished on the undelivered portion of this contract.

(6) The Contractor is realizing less profit than that reflected in the establishment of any alternate liquidation rate ... and that rate is less than the progress payment rate. . . .

48 C.F.R. ¶ 52.232–16 (1993) (Alternate I). These provisions lay the framework for the use of progress payments, but, unlike the provisions applicable in the contract in *Blinne Contracting,* they do not mandate payment. Both the notice and the Progress Payments clause itself are conditional. When conditions for the approval of a progress-payment request are not met, the government can properly withhold a progress payment. *See Appeal of McDonald Welding & Machine Co.,* 94–3 B.C.A. (CCH) ¶ 27,181, at 135,446, 1994 WL 508951 (ASBCA 1994).[7]

Moreover, certain conditions must be satisfied to initiate progress payments under subpart 32.5 of the FAR, which is applicable to this contract through the Notice of Progress Payments Clause, FAR paragraph 52.232–13. That subpart creates a presumption that progress payments will be made for contractors in sound financial condition:

For contractors that the administrative contracting officer (ACO) has found by previous experience or recent audit review (within the last 12 months) to be (1) reliable, competent, and capable of satisfactory performance, (2) possessed of an adequate accounting system and controls, and (3) in sound financial condition, progress payments in amounts requested by the contractor should be approved as a matter of course.

48 C.F.R. ¶ 32.503–3(a) (1993). That provision, however, goes on to provide that:

For all other contractors, the ACO shall not approve progress payments before determining (1) that (i) the contractor will be capable of liquidating any progress payments or (ii) the Government is otherwise protected against loss by additional protective provisions, and (2) that the contractor's accounting system and controls are

---

**7.** In *McDonald Welding,* the government refused to issue a progress payment because the contractor's accounting system was not adequate, despite the fact that previous progress payments were authorized. The board held that the failure to pay progress payments was not a material breach, relying on FAR paragraph 52.232–16(c). *See Appeal of McDonald Welding & Mach. Co.,* 94–3 B.C.A. (CCH) ¶ 27,181, at 135,446, 1994 WL 508951 (ASBCA 1994). The board noted that the contracting officer's finding that the unliquidated progress payments exceeded the fair value of the work remaining under the contract also supported withholding progress payments. *See id.*

adequate for proper administration of progress payments.

*Id.* ¶ 32.503–3(b), 1994 WL 508951.

 Unless the ACO has had previous experience with the contractor or a favorable recent audit regarding progress payments, a determination must be made as to the adequacy of the contractor's accounting system and the capability of the contractor to liquidate payments before progress payments can be made. *See id.* Because this was QMS–EF's first experience with a government contract, there was no opportunity for the ACO to have had prior experience with QMS–EF regarding progress payments. Plaintiff, however, argues that a determination regarding the adequacy of QMS–EF's accounting systems—thus implicating the presumption in paragraph 32.503–3(a)—was made during the preaward survey. According to plaintiff, FAR paragraph 9.105–1, which deals with procedures for obtaining information for making responsibility determinations, required the agency to obtain the information necessary to evaluate the adequacy of QMS's accounting systems. Paragraph 9.105–1 reads, in pertinent part:

> Before making a determination of responsibility, the contracting officer shall possess or obtain information sufficient to be satisfied that a prospective contractor currently meets the applicable standards in 9.104.

> Generally the contracting officer shall obtain information regarding the responsibility of prospective contractors, including requesting preaward surveys when necessary.... Preaward surveys shall be managed and conducted by the surveying activity.... The administrative contracting officer shall obtain from the auditor any information required concerning the ade-

quacy of prospective contractors' accounting systems and these systems' suitability for use in administering the proposed type of contract.

48 C.F.R. ¶ 9.105–1 (1993). Plaintiff reads paragraph 9.105–1 in conjunction with paragraph 32.503–3(a), as having required the agency to conduct a preaward survey to assess QMS–EF's accounting systems with respect to the ability to make progress payments. Because the preaward survey was silent with regard to the accounting systems, plaintiff contends that the survey determination of responsibility amounts to a tacit approval of the accounting system, placing QMS–EF within subparagraph (a), which states that progress payments shall be approved "as a matter of course."

Plaintiff is incorrect in its reading of paragraph 9.105–1. Subpart 9.1 concerns the determination of responsibility immediately after bids are opened, not the determination of whether progress payments should be initiated. The standards applied are taken from paragraph 9.104–1,[8] not paragraph 32.503–3. The question of responsibility is much broader than the question of whether progress payments are viable. While some of the same considerations may be brought to bear in considering whether a bidder is responsible, the determination is a wholly separate one.

A responsibility determination addresses in a general way the financial wherewithal and general business competence of a bidder. A survey sufficient to satisfy paragraph 32.503–3, however, focuses on specific factors seen as preconditions to receiving progress payments. The inquiries are the same neither in purpose nor in practice. In her sworn statement, the ACO, Lynne Rahtes,

---

8. Paragraph 9.104–1 states:
 To be determined responsible, a prospective contractor must—
 (a) Have adequate financial resources to perform the contract ...;
 (b) Be able to comply with the required or proposed delivery or performance schedule ...;
 (c) Have a satisfactory performance record ...;
 (d) Have a satisfactory record of integrity and business ethics;

 (e) Have the necessary organization, experience, accounting and operational controls, and technical skills ...;
 (f) Have the necessary production, construction, and technical equipment and facilities ...;
 (g) Be otherwise qualified and eligible to receive an award under applicable laws and regulations.

recites that the preaward survey audit of an accounting system in connection with the responsibility determination is less detailed than an audit to determine suitability for progress payments.[9] Thus a determination of responsibility in a preaward survey cannot be considered a determination that progress payments are appropriate under either FAR subparagraphs (a) or (b) of 32.503-3. Furthermore, if a preaward survey satisfied the requirement for a "recent audit review" under paragraph 32.503-3(a), then almost all responsible bidders, regardless of the ACO's experience with the particular contractor, would be entitled to progress payments upon entering the contract. This interpretation would make FAR paragraph 32.503-3 meaningless.[10]

■ Nor are paragraphs 32.503-3(b) and 52.232-16(c) inconsistent. In order to initiate progress payments, paragraph 32.503-3(b) requires that the ACO be satisfied that the contractor will be able to liquidate progress payments made and that its accounting system and controls are adequate for administrating progress payments properly. If those conditions are met—and here they were not—the contractor is entitled to progress payments. Because the ACO was never satisfied that the conditions of FAR paragraph 32.503-3 were met in the first instance, QMS-EF was not entitled to progress payments "as a matter of course."[11] Even if progress payments are generally approved, however, paragraph 52.232-16(c) provides limited reasons for which the progress payments can be either reduced or suspended. The government's failure to make progress payments, therefore, was not a breach of contract and not an excuse for QMS-EF's failure to perform.

## B. Superior Knowledge

■ When the government withholds special knowledge of some novel matter that it knows the contractor needs to complete performance and that the contractor would not have reason to know, the government breaches its implied duty of good faith and fair dealing such that default termination of the contractor is inappropriate. See Helene Curtis Indus., Inc. v. United States, 160 Ct.Cl. 437, 444–45, 312 F.2d 774 (1963). Plaintiff argues that termination for default was inappropriate here because the agency withheld crucial knowledge regarding the approval of progress payments. According to plaintiff, the government breached the contract by failing to inform QMS-EF of its intent to delay and ultimately reject the request for progress payments.

Plaintiff's argument and reliance on Helene Curtis here, however, have no merit. In

9. Indeed, according to Ms. Rahtes, the preaward survey is typically conducted by a different group than a progress-payment determination.

10. Plaintiff also cites FAR paragraph 32.502-1(a) as entitling QMS-EF to progress payments as a matter of course. Paragraph 32.502-1, however, is intended to give guidance to contracting officers as to whether to include the Progress Payments clause in the contract, not to provide a standard for approving a request for progress payments. Furthermore, the terms of that paragraph are not mandatory:

> [T]he contracting officer *may provide* for customary progress payments if the contractor (1) will not be able to bill for the first delivery of products, or other performance milestones, for a substantial time after work must begin ... and (2) will make expenditures for contract performance during the predelivery period that have a significant impact on the contractor's working capital.

48 C.F.R. ¶ 32.502-1(a) (1993) (emphasis added). Satisfaction of these criteria does not entitle QMS-EF to automatic approval of progress payments. Initiation of progress payments is still subject to paragraph 32.503-3.

11. Even if QMS-EF was entitled to progress payments, defendant contends that plaintiff cannot show that its failure to perform in a timely manner was caused by the failure of the agency to make progress payments, because QMS-EF had a line of credit from the lumber supply company and was able to obtain materials to perform under the contract. QMS-EF was able to perform, at least to some degree, despite not receiving any progress payments on this contract. The court notes that this evidence conflicts with Mr. Holmich's sworn statement that QMS-EF was dependent upon the prospect of progress payments and that the lack of any progress payments caused the company's financial troubles. This conflict creates a fact question as to whether the failure to make progress payments was the primary or controlling cause of QMS-EF's default. Because the court holds that QMS-EF was not entitled to progress payments, however, the question is not material to deciding this motion.

*Helene Curtis,* the government neglected to inform the contractor that a certain chemical that the contractor was to mix to create a disinfectant powder needed to be ground before mixing. The contractor's default was a direct result of not grinding the chemical before mixing. The Court of Claims held that the government had an obligation to inform the contractor because the disinfectant was a novel product and because the government had sponsored the original research on the disinfectant and was in a better position to know what was required. *See id.* The case in effect endorses a warranty of specifications under those circumstances.

Here, however, the contract does not involve any novel product or service as to which the government has special information. The information that plaintiff alleges is special is the knowledge that progress payments may or may not be paid. This is not the type of technical information essential to proper performance contemplated in *Helene Curtis.* Furthermore, it is clear that the agency did not know it was going to reject the request until after the first audit was performed. *Cf. McDonald Welding,* 94–3 B.C.A. (CCH) at 135,442, 1994 WL 508951 (stating that government did not know before modification that disputed drawing would be included in contract). At that point, QMS–EF was fully informed of the rejection and the reasons for the rejection, in addition to being given the opportunity to correct the deficiencies.

C. *Failure to Follow Termination for Default Procedure*

Finally, plaintiff alleges that the agency, in terminating the contract for default, did not fairly evaluate whether the progress payments were properly withheld. In support of

its argument, plaintiff cites the deposition testimony of James Sheetz, a contract specialist at the Naval Surface Warfare Center, who states that the DCMAO did not participate in the decision to terminate QMS–EF for default.

 A termination for default is reviewed to determine if the TCO abused his discretion. *See Schlesinger v. United States,* 182 Ct.Cl. 571, 583–84, 390 F.2d 702 (1968). In the agency's "Determination to Terminate a Contract for Default" memorandum, each of QMS–EF's proffered excuses is addressed. (*See* Def.'s Br. of 4/25/97, app. at 103–09.) That memorandum tracks the factors outlined in FAR paragraph 49.402–3(f)[12] that the TCO had to consider in determining whether to terminate for default. It specifically cites the ACO's determination that the contractor was not making sufficient progress on the contract to liquidate progress payments. Thus it seems that the TCO addressed all the factors outlined by the FAR in determining to terminate QMS–EF for default.

Plaintiff, however, alleges that the agency did not truly address the issues raised by QMS–EF's response to the show-cause letter. By not investigating the reasoning behind DCMAO's denial of progress payments, plaintiff alleges, the agency failed to exercise discretion in terminating for default. In essence, plaintiff contends that the TCO should have contacted the ACO and interrogated her about the denial of the progress payments.

Plaintiff cites *McDonnell Douglas Corp. v. United States,* 35 Fed.Cl. 358 (1996), for the proposition that a failure to use reasoned discretion in terminating a contract for default is not harmless error. Plaintiff's reli-

12. FAR paragraph 49.402–3(f) states:

The contracting officer shall consider the following factors in determining whether to terminate a contract for default:
 (1) The terms of the contract and applicable laws and regulations.
 (2) The specific failure of the contractor and the excuses for the failure.
 (3) The availability of the supplies or services from other sources.

 (4) The urgency of the need for the supplies or services and the period of time required to obtain them from other sources....
 (5) The degree of essentiality of the contractor in the Government acquisition program....
 (6) The effect of a termination for default on the ability of the contractor to liquidate guaranteed loans, progress payments, or advance payments.
 (7) Any other pertinent facts and circumstances.

ance on *McDonnell Douglas*, however, is misplaced here. In that case, the Navy issued a show-cause order citing failure to meet certain contract milestones in a timely fashion. The court held that the show-cause order was a pretext; the termination was actually ordered by the Secretary of Defense. *See McDonnell Douglas Corp.*, 35 Fed.Cl. at 369 (citing *Schlesinger*, 182 Ct.Cl. at 584, 390 F.2d 702). The court applied the principle that the contracting officer cannot blindly accept directions from others without abusing the discretion required to terminate for default. *See id.* at 369.

The facts here are vastly different from those of *McDonnell Douglas*. The TCO, with help from the contract specialist working under her, evaluated the circumstances surrounding the performance of this contract, including plaintiff's excuses. There is no indication that she blindly followed the directions of another party. She stated in her deposition testimony that "[b]ased on [her] review of the information, ... DCMAO Clearwater was proper in their determination not to award progress payments." The mere fact that the TCO relied on audit reports and other documents does not demon-strate an abuse of discretion. The TCO was entitled to rely upon the reports and findings of the DCMAO to determine that the withholding of progress payments was proper. Moreover, in hindsight, there was no reason to think that the denial of progress payments was improper, for the reasons explained above. The court is satisfied that the TCO properly exercised her discretion in terminating the contract for default.

## CONCLUSION

Failure to provide QMS–EF with progress payments was not a breach of contract. Accordingly, there was no excuse for the undisputed failure to timely perform. Plaintiff's motion for summary judgment is therefore denied, and defendant's motion for summary judgment is granted. The Clerk is directed to dismiss the complaint. No costs.