**THE LIBERTATIA ASSOCIATES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 93–459 C.

United States Court of Federal Claims.

May 23, 2000.

Howell Roger Riggs, Huntsville, AL, for plaintiff.

Robert McAuliffe, with whom were David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, James M. Kinsella, Deputy Director, U.S. Department of Justice, Washington, DC for defendant. Major Richard C. Gross, Litigation Attorney, U.S. Army Litigation Division, of counsel.

*OPINION AND ORDER*

HEWITT, Judge.

Plaintiff, The Libertatia Associates, Inc. (TLA or plaintiff), asks the court to find that defendant, the United States (government or defendant) acted in bad faith in administering and terminating plaintiff's contract and to declare plaintiff entitled to the conversion of the termination for default into a termination

for convenience.[1] Plaintiff's Post Trial Brief (Pl.'s Br.) at 20. Defendant argues that the default termination was justified and should be upheld. Defendant's Post Trial Brief (Def.'s Br.) at 1. This case is before the court following a full trial on the merits of plaintiff's claim that it was wrongfully terminated for default.

## I. Background [2]

### A. Formation of the Contract

On December 9, 1991, the Directorate of Contracting at Fort Rucker, an Army base located in southeastern Alabama, issued an Invitation for Bids for a grounds maintenance contract involving the Cantonment and Family Housing areas on the Army base. Defendant's Statement of Relevant Facts (Def.'s Facts) at ¶¶ 2, 13. On January 17, 1992, TLA bid on the contract. Plaintiff's Statement of Facts (Pl.'s Facts) at ¶ 1; Def.'s Facts at ¶ 15. The procuring contracting officer requested that TLA verify its bid. Pl.'s Facts at ¶ 2; Def.'s Facts at ¶ 17. After analyzing the number of employees necessary and the amount of time necessary for performance of the contract, TLA verified its bid on February 5, 1992. Pl.'s Facts at ¶ 2; Def.'s Facts at ¶¶ 18–20. On February 12, 1992, TLA was awarded the contract for the period April 1, 1992 through March 31, 1993. Pl.'s Facts at ¶ 1; Def.'s Facts at ¶ 23.[3]

The contract was a requirements type contract under which delivery orders were to be issued by the government every two weeks. Def.'s Facts at ¶ 26; Defendant's Exhibit (DX) 10 at ¶ C.5.1.6. The contract contained standard government contract clauses including FAR clause 52.246–4, Inspection of Services—Fixed Price (April 1984). DX 10 at BN 483. The contract also contained clause E.4 which provided for reperformance for work determined to be unacceptable by the government. DX 10 at ¶ E.4.2. The contract also provided that, after reperformance, the Contracting Officer (CO) would "determine what percentage of the area or requirement is unacceptable." DX 10 at ¶ E.4.2. Further to the same contract provision, the government took deductions from TLA's invoices when it found areas that remained unacceptable after reperformance.

The contract contained the standard FAR default provision for fixed price service contracts. Def.'s Facts at ¶ 31 (quoting 48 C.F.R. § 52.249–8 (Apr.1984)). The contract required TLA to submit weekly work schedules that identified when and where each requirement would be performed on each day. DX 10 at ¶ E.4.1, Def.'s Facts at ¶ 32. The contract required TLA to file a specific form by specified times to request inspections. DX 10 at ¶ E.4.1. This provision also stated that "[t]he Contractor's Chief of Quality Control may accompany the Inspector during inspections and re-inspections." DX 10 at ¶ E.4.1.

### B. Administration of the Contract

The CO for the contract was Linda Smith. Def.'s Facts at ¶ 38. The Contracting Officer's Representative (COR) for the contract was A.L. Barnard. Def.'s Facts at ¶ 40. Two other government employees, William McKinzie and Elbert Williams, performed some inspections of TLA's work under the contract. Def.'s Facts at ¶ 42.

Nine Delivery Orders were issued under the contract. On March 11, 1992, Delivery Order one was issued for the period of April

---

1. Plaintiff's Complaint sought monetary damages for breach of contract. Complaint at ¶¶ 14–18. However, on March 16, 1994 the parties stipulated the dismissal of monetary damages. The court issued an Order on March 18, 1994 dismissing plaintiff's damages claim without prejudice.

2. The facts stated in the Background section are taken from the undisputed portions of Stipulations of Fact presented by plaintiff and defendant's Statement of Relevant Facts. Notwithstanding a pretrial order that it do so, plaintiff failed to identify which of defendant's Statement of Relevant Facts it disputed in its pretrial filings with the court. See Pretrial Order dated January 29, 1998. That failure was not pressed by defendant and the court does not rely on any of defendant's facts that were clearly disputed by plaintiff at trial. See, e.g., Def.'s Facts at ¶ 135 ("The COR acted in good faith in administering the Cantonment Contract.").

3. TLA was also awarded a contract for grounds maintenance of airfields and related areas for the same period. Pl.'s Facts at ¶ 12; Def.'s Facts at ¶ 115.

6—17, 1992. Def.'s Facts at ¶ 45. TLA's performance was judged by the COR and Mr. McKinzie to be 31% unsatisfactory. DX 104. On April 14, 1992, Delivery Order two was issued for the period of April 20—May 1, 1992. Def.'s Facts at ¶ 55. TLA's performance was judged by the COR and Mr. McKinzie to be 35% unsatisfactory. DX 104. On April 28, 1992, Delivery Order three was issued for the period of May 4—15, 1992. Def.'s Facts at ¶ 59. TLA's performance was judged by the COR and Mr. McKinzie to be fully satisfactory. DX 104. On May 8, 1992, Delivery Order four was issued for the period of May 18—29, 1992. Def.'s Facts at ¶ 62. TLA's performance was judged by the COR to be virtually satisfactory, except for a defect resulting in a $21.76 deduction from the $5,473.98 order. DX 104. On May 27, 1992, Delivery Order five was issued for the period of June 1—12, 1992. Def.'s Facts at ¶ 64. TLA's performance was judged by the COR, Mr. McKinzie and Mr. Williams to be 11% unsatisfactory. DX 104. On June 8, 1992, Delivery Order six was issued for the period of June 15—26, 1992. Def.'s Facts at ¶ 70. TLA's performance was judged by Mr. McKinzie and Mr. Williams to be 11% unsatisfactory. DX 104.

On June 9, 1992, Delivery Order seven was issued for the period of June 29—July 10, 1992. Def.'s Facts at ¶ 75. For the first week of Delivery Order seven, 21% of the work ordered was not completed to the satisfaction of the government. Plaintiff's Exhibit (PX) 148. The second week of Delivery Order seven, 11% of the work ordered was not completed to the satisfaction of the government. PX 148. TLA's performance under Delivery Order seven was judged by the COR and Mr. McKinzie to be 15% unsatisfactory.

On July 8, 1992, representatives from TLA and government contracting staff at Fort Rucker met at a Performance Evaluation Meeting to discuss TLA's performance and the possibility of a termination for default. Def.'s Facts at ¶¶ 79–81; DX 39. In addition to certain government concerns about violations by TLA employees of safety procedures, TLA's performance on Delivery Order

five and six were discussed at this meeting. DX 39.

On July 9, 1992, Delivery Order eight was issued for the period of July 13–24, 1992. Def.'s Facts at ¶ 86. For the first week of Delivery Order eight, 3% of the work ordered was not completed to the satisfaction of the government. PX 148. The second week of Delivery Order eight, 26% of the work ordered was not completed to the satisfaction of the government. PX 148. TLA's performance under Delivery Order eight was judged by the COR to be 19% unsatisfactory. DX 104.

Just as the performance of Delivery Order eight was beginning, on July 14, 1992, the CO issued a Cure Notice to TLA regarding its failure to complete Delivery Order seven. Def.'s Facts at ¶ 82; PX 65. This cure notice gave TLA ten days to correct the noted failures in its performance. Def.'s Facts at ¶ 83. On July 14, 1992, TLA requested a clarification on the Cure Notice regarding what would constitute objective proof of performance. Def.'s Facts at ¶ 84; PX 64. On July 16, 1992, the CO advised TLA that it must complete all areas contained in Delivery Order eight. Def.'s Facts at ¶ 85; PX 71.

Delivery Order nine was issued on July 17, 1992 for the period of July 27—August 7, 1992. Def.'s Facts at ¶ 92. Just as the performance of Delivery Order nine was beginning, on July 28, 1992, the CO issued a forbearance notice stating that TLA had failed to complete Delivery Order eight and requiring TLA to cure other violations of the contract. Def.'s Facts at ¶ 90; PX 87. The CO selected as the end date of the forbearance period the last day covered by Delivery Order nine. The forbearance notice stated that "some progress toward a cure has been noted during the cure period." PX 87. However, the notice also stated that Delivery Order eight was not completely accomplished, safety concerns have not been fully cured, contract provisions regarding timeliness had been violated and services on the school grounds remained not fully cured. PX 87. "The condition for the forbearance is that not later than August 7, 1992 all conditions listed above are cured." PX 87; Def.'s Facts at ¶ 91.

For the first week of Delivery Order nine, .003% of the work was not completed. PX 148.[4] For the second week of Delivery Order nine 19% of the work was not completed. PX 148. Of the final twelve inspections conducted prior to termination for default, nine were 100% satisfactory, the inspection on August 2, 1992 was 99% satisfactory, the inspection on August 7, 1992 was 95% satisfactory and the final inspection on August 8, 1992 was 59% satisfactory. PX 147.[5]

### C. Termination of the Contract

On August 8, 1992, the CO and the COR inspected the areas listed on Delivery Order number nine. Def.'s Facts at ¶ 98. The final inspection, conducted without an opportunity for reperformance, was judged to be 59% acceptable. PX 147. The CO issued a termination for default via facsimile on August 8, 1992. Def.'s Facts at ¶ 111; DX 86.

Officers of TLA attempted to contact the CO repeatedly on the morning of August 8, 1992 to request attendance at the inspection. Pl.'s Facts at ¶ 48. The CO did not return phone calls to TLA prior to the termination for default. Pl.'s Facts at ¶ 48. In the early afternoon of August 8, 1992, two of TLA's officers videotaped areas they believed had been inspected the morning of August 8, 1992. Pl.'s Facts at ¶ 48. TLA did not receive inspection reports from the August 8, 1992 inspection until August 11, 1992. Pl.'s Facts at ¶ 45. The inspection reports provided to TLA on August 11, 1992 did not include a report on Area 58. Pl.'s Facts at ¶ 46.

## II. Discussion

### A. Burden of Proof

▮ It is well-settled in this court that "default-termination is a drastic sanction, which should be imposed (or sustained) only for good grounds and on solid evidence." *J. D. Hedin Constr. Co. v. United States*, 187

Ct.Cl. 45, 408 F.2d 424, 431 (1969); *CJP Contractors, Inc. v. United States*, 45 Fed.Cl. 343, 371 (1999) (internal quotations omitted). The initial burden in a termination for default case is on the government to establish that the contractor was in default. *See Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed.Cir.1987); *Florida Engineered Constr. Prods. Corp. v. United States*, 41 Fed.Cl. 534, 538 (1998). If default is established, then the burden shifts to the contractor to show that its failure to perform was excusable. *Florida Engineered*, 41 Fed.Cl. at 538–39; *CJP Contractors*, 45 Fed.Cl. at 371.

### B. Establishing Default

The government presented evidence regarding its termination of the contract for default to support the conclusion that TLA "failed to perform the services within the time specified in this contract ... failed to make progress, so as to endanger performance of this contract ... and failed to perform other provisions of the Cantonment Contract." Def.'s Br. at 10 (incorporating the default clause of the FAR) (internal quotations omitted). The government's evidence consisted of inspection reports, photographs and testimony of employees who inspected TLA's performance. Plaintiff presented evidence regarding the government's interference with plaintiff's work under the contract, plaintiff's perception of disparate treatment as compared with the treatment of previous contractors, and the bad faith exhibited by the COR and the CO in administering the contract. Pl.'s Br. at 1–2. The court heard testimony from nineteen witnesses and considered numerous exhibits during a five day trial.

Based on the evidence offered at trial, the court believes it to be clear that plaintiff's performance of the contract was not 100%

---

4. Plaintiff's Exhibit 148 was admitted into evidence at trial without objection through the testimony of Mr. Tem Tew, President of TLA. Tr. at 1105. Mr. Tew testified that he prepared this summary shortly after Delivery Order eight by using the work orders, work schedules and the inspection reports. Tr. at 1101–2. The phrase "was not completed" is the terminology used for the figures cited in the exhibit. *See* PX 148.

5. The terms "satisfactory" and "acceptable" were used interchangeably by both parties at trial to indicate the amount of work performed without deductions from plaintiff's invoice. This particular exhibit used the term "acceptable." For consistency, the court uses the term "satisfactory."

satisfactory for every Delivery Order. However, the court notes that the evidence presented at trial may not indicate the true level of performance attained in light of the question of whether the primary inspector, the COR, exhibited ill will and an intent to injure plaintiff. Evidence was presented that the COR was the dominant figure in evaluating TLA's performance and that he filled out the vast majority of relevant inspection reports, facts which call into question most of the paperwork offered as evidence of poor performance. At trial, the COR testified that he did not possess any independent recollection of the specific inspections and could only rely on the inspection reports. Trial Transcript (Tr.) at 379–80.

The photographic evidence presented by defendant did not reflect a reliable view of the performance of TLA because the photos were often taken before reperformance[6] and were not taken at a sampling of times and areas. In addition, there was testimony that, when the COR would order plaintiff's employees back to an area for the purpose of reperformance, the employees could not determine what aspect of the work needed to be reperformed. Tr. at 1056–58.[7] Plaintiff presented a videotape as evidence that it had performed in accordance with the contract on the day it was terminated for default. There are similar problems with the reliability of this evidence because it is unclear what portions of the Army base are covered by the video and the footage does not provide a complete view of those areas where the final inspections took place.

Plaintiff presented evidence of the government's breach of its duty of good faith. This evidence was testimony that the COR made comments to several witnesses which demonstrated his personal animosity toward plaintiff. Tr. at 769–70, 1039–40, 1079, 1148. Testimony was also presented that the COR had boasted of the financial benefit to himself of ordering overtime on plaintiff's contract. Tr. at 1037–38. Plaintiff also presented testimony to support its argument that the COR engaged in overzealous inspection under the contract which caused delays and added expenses for plaintiff. Tr. at 692–93, 1040, 1057. The evidence of government breach was of sufficient gravity to merit careful examination by the court.

C. The Government Acted in Bad Faith in Terminating the Contract for Default

▬ It is well settled in the case law that government officials are presumed to act conscientiously and in good faith in the discharge of their duties. *See, e.g., Spezzaferro v. Federal Aviation Admin.*, 807 F.2d 169, 173 (Fed.Cir.1986); *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298 (1976); *Asco–Falcon II Shipping Co. v. United States*, 32 Fed.Cl. 595, 604 (1994). In order to overcome this presumption, plaintiff must allege and prove, by clear and strong evidence, specific acts of bad faith on the part of the government. *Asco–Falcon*, 32 Fed.Cl. at 604 (citing *Continental Collection & Disposal, Inc. v. United States*, 29 Fed.Cl. 644, 652 (1993)). The level of proof to overcome this presumption is high. "It requires well nigh irrefragable proof to induce the court to abandon the presumption of good faith dealing." *Kalvar*, 543 F.2d at 1301–02. According to the Federal Circuit, the "well nigh irrefragable proof" required under this stan-

---

**6.** Defendant argued that the court should focus on the initial inspection of TLA's work. However, the contract provides the contractor with a right to reperform. DX 10 at ¶ E.1. The government also argues that TLA's decision on certain occasions to take deductions from payment rather than to reperform justified the termination for default. *Compare Appeal of Spiffy Enterprises*, 90–1 BCA 22,385 (Oct.1989) (minor deficiencies not sufficient to justify termination for default when standards are higher than government could possibly expect to be achieved; numerosity of deficiencies didn't justify termination for default); *with Cervetto Bldg. Maintenance Co. v. United States*, 2 Cl.Ct. 299, 301 (1983) (upholding a termination for default because deficiencies should be the exception). Because the court finds that the defendant intended to injure plaintiff, we do not determine whether or not the deficiencies in plaintiff's performance could have justified a termination for default.

**7.** "Q: Did he ever take you to an area where there was grass that wasn't cut? A: No. Q: Did he ever take you to an area where it hadn't been properly trimmed? A: No.... Q: So is it your testimony that every time Mr. Barnard took you back to an area, that all you ever found were a few seed heads? A: Yes." Tr. at 1057–58.

dard "has been equated with evidence of some specific intent to injure the plaintiff." *Kalvar*, 543 F.2d at 1302; *see also Librach v. United States*, 147 Ct.Cl. 605, 614, 1959 WL 7633 (1959) (finding no bad faith because officials involved were not "actuated by animus").

The phrase "well nigh irrefragable proof" has become almost a mantra to express the legal standard for proof of a breach of the duty of good faith and fair dealing. A recent ruling stated that the presumption that government officials act in good faith "may be reversed only with *'irrefragable proof'* of animus, or specific intent to injure, the plaintiff." *Slattery v. United States*, 46 Fed.Cl. 402, 405 (2000) (emphasis added) (citing *Green Mgt. Corp. v. United States*, 42 Fed. Cl. 411, 439 (1998)). In rhetoric at least, it appears that this court is sometimes dropping the qualifying "well nigh" and resting with a standard requiring "irrefragable proof."

In the effort to employ the almost-mantra of "irrefragable proof" as a legal standard, the court has found it helpful to stop and look at what the words mean. The American Heritage Dictionary of the English Language defines "irrefragable" as "[i]mpossible to refute or controvert; indisputable." *The American Heritage Dictionary of the English Language* 953 (3d ed.1996). This standard appears to the court to exceed even the certainty required by proof "beyond a reasonable doubt," the higher standard used in criminal proceedings (a standard inapplicable to proceedings in this court). Applying the standard of "irrefragable proof" meaning "impossible to refute" would appear to insulate government action from *any* review by courts—no matter how egregious. Such an absolute standard would not serve the inter-

ests of justice between the government and its citizens.[8] The courts are certainly not called on to allow governmental actors to treat contractors with bad faith or a specific intent to injure in any case where the bad faith is not, in effect, admitted by the government. The court therefore considers whether the plaintiff in this case has shown "evidence of some specific intent to injure" plaintiff by the government or whether the government was "actuated by animus toward the plaintiff[ ]." *Kalvar*, 543 F.2d at 1302; *Librach*, 147 Ct.Cl. at 614.

Plaintiff contends that the government breached the contract by failing to carry out its obligation of good faith and fair dealing when the COR exhibited an intent to ruin plaintiff or run plaintiff off the Army base (Pl.'s Brief at 1–5). Plaintiff also claims that the government acted arbitrarily and capriciously in terminating the contract for default as a result of overzealous inspection of plaintiff's work.[9] Pl.'s Brief at 6. There is significant evidence that the government acted in bad faith in its administration and termination of the contract.

### 1. Evidence of Bad Faith of the COR

Plaintiff argues that the government's actions were motivated by the COR's personal animosity and personal greed. Pl.'s Br. at 3. To support its argument, plaintiff offered at trial evidence of the government's ill will and a specific intent to injure plaintiff.

The testimony showed the COR to be a contracting official without a proper understanding of his role. The COR admitted that he told many employees of TLA that they should think of him as "Jesus Christ" and the CO as "God."[10] Tr. at 376 (testimony of

---

8. In the words of President Lincoln, "It is as much the duty of government to render prompt justice against itself, in favor of citizens, as it is to administer the same, between private individuals." Wilson Cowen, Philip Nichols, Jr. and Marion Bennett, *The United States Court of Claims, A History, Part II*, p. 171, reprinted in 216 Ct.Cl. 1, 20–21, 573 F.2d 52 (1978) (quoting 62 Cong. Globe, 37th Cong., 2d Sess., App. at 2 (1862) (President Lincoln's 1861 Annual Message to Congress)).

9. Plaintiff also argues that other contractors were treated differently or preferentially by the COR. Pl.'s Br. at 10, 17, Tr. at 1273. The court notes that "alleged disparate treatment, absent an allegation of malice or intent to harm, is insufficient to state a claim based on bad faith." *Asco-Falcon*, 32 Fed.Cl. at 604–05. However, such evidence is relevant in this case because plaintiff alleges and has presented evidence of an intent to harm.

10. The testimony of the COR was elicited during a direct examination which appeared to be calcu-

COR); Tr. at 1041 (testimony of Mr. Folmar that the COR "considered hisself as Jesus"). In addition to casting himself as Christ, the COR explained to TLA's employees that the other inspectors were like "disciples." Tr. at 376 (testimony of COR).

The court found credible the testimony offered by plaintiff regarding the COR's use of intimidation and coercion in the course of administering government contracts on the Army base. Mr. James Votaw, a contractor not affiliated with TLA who performed maintenance on the Army base, testified, "At Fort Rucker, Mr. Barnard intimidated almost all the local employees." Tr. at 737, 747. Mr. Votaw also testified that he felt threatened when the COR told him not to help plaintiff perform during the forbearance period because that would cause Mr. Votaw to fall out of favor with the COR and the CO. Tr. at 736–37. *See also* Tr. at 1079 (testimony of Mr. Steven Theobald).

The COR's personal animosity toward the officers of TLA was established by another contractor performing maintenance and by a former government employee. Mr. Votaw testified that the COR expressed "almost from the very beginning, . . . [that TLA] w[as]n't going to be able to complete the job with the money they put in and the experience they had." Tr. at 733. Mr. Votaw also testified that the COR expressed his dislike for the president of TLA "almost daily" and that "he didn't like TLA as a whole." Tr. at 769–70. Ms. Reeves, a clerk stationed in the front reception area of the building where the CO had her office, testified that she often heard the COR express personal animosity for the officers of TLA. Tr. at 1157–58. Ms. Reeves testified that the COR called the president of TLA "a [vulgar epithet]" and that the COR said that "he was going to fix them." Tr. at 1157–58, 1161; *see* Robert L. Chapman, *American Slang*, pp. xxiii, 17 (1987). Ms. Reeves also recalled that after the termination for default had been issued the COR "c[a]me in the building and he was very happy and kind of held his hands up, you know, it's over, like it was somewhat amusing." Tr. at 1163.

Testimony was also given by several witnesses about a meeting between plaintiff and defendant in the barn where plaintiff's equipment was stored. One of plaintiff's employees, who also worked under the preceding and subsequent contractors (Tr. at 1037), testified that at this meeting the COR said to the president of TLA that he would "break" them. Tr. at 1039–40.[11] Mr. R.V. Folmar recalled that the CO, Ms. Smith, was present when this threat was made, but he could not be sure if she had heard the statement. Tr. at 1040. Other witnesses offered credible testimony of the COR's expression of the

---

lated to cast the COR's words in the most benevolent possible light.

Q: Mr. Barnard, have you ever referred to yourself as Jesus Christ?
A: Yes, sir.
Q: Could you explain that?
A: Well, it's like—
Q: First, let me ask when did it happen?
A: When you're talking to employees and contractors, they would ask questions on how the contract runs and different things and when you go out here, your weedeaters or your laborers on ground maintenance contracts are not, let's say, the most educated people as far as education, but they're raised in the south and the Baptist bible belt, they can relate to the Bible. And so they ask questions that say well, what's going to happen, the General is going to get mad and all that, and I say well, the General runs the base; Ms. Smith is the contracting officer, she's the one that has the ultimate authority and I said—I would explain that that would be like God, being the ultimate authority, and that in relationship to her, I was

Jesus Christ, I was the one that she had sent out to inspect this contract. Okay? And that Mack and Mr. Williams or other inspectors that would come out would be kind of like disciples. But just in that to kind of relate on how the duties were assigned that these people could relate to that philosophy.
[Counsel] Your Honor, I have nothing further. Tr. at 376. Testimony of other witnesses made it clear to the court that neither the CO nor the COR was perceived as benevolent in this connection.

11. Mr. Folmar explained that the government made it clear that plaintiff would have to purchase some additional equipment to adequately perform the contract. Mr. Folmar testified that in response, "I think Mr. Tew said that we came this far and they haven't broke us yet and [the COR] turned around and said well—I think it kind of made him mad when he said that because he turned around and he flipped his cap and he said well, I'll have to show them, you know, I'm going to break them. That's the statement I remember him saying." Tr. at 1039–40.

same specific intent to injure TLA. Tr. at 690–91 (Mr. Siler); Tr. at 1079, 1095 (Mr. Theobald).

Mr. Folmar testified that the COR repeatedly talked about how TLA was going to lose the contract several months prior to the termination for default. Tr. at 1038. "[H]e was always talking about he was going to run [TLA] off. He made that statement quite often." Tr. at 1038. Another witness, Mr. Theobald, corroborated this testimony by stating that "I did hear—I was amongst people and I was standing there and I did hear the words said, that I [the COR] will run TLA off, get rid of them, to make it blunt." Tr. at 1079.

In addition to evidence of the COR's personal animosity toward plaintiff, numerous witnesses testified that the COR expressed his desire to cause TLA's employees to work overtime because it benefitted him financially. Mr. Folmar testified, "On several occasions we spoke of—that [the COR] was trying—when he first started the contract, that he was going to run [off] TLA because they come in and wasn't going to work but like 40 hours a week when we first started and he needed more than 40 hours a week. So he said he needed some overtime and TLA wasn't giving any overtime at the beginning of the contract." Tr. at 1037–38.

The government clerk in the reception area, Ms. Reeves, testified that "[t]here were many times he would come in the building and he would talk about—and I would maybe not be the only one there, a lot of people would hang around the front desk, I guess it was kind of like a chatting area or something, but he would talk about how he was working 100 hours overtime, 80 hours overtime a week and that that was paying for his house.... And he would make remarks about how his overtime was going to pay for his house and that he was—I believe at the time he was a GS–6 or 7 and that he was making GS–12 pay with the overtime. I

remember him stating that several times." Tr. at 1154–55.[12] Ms. Reeves also recalled the CO's presence in the vicinity of the front desk when the COR said that "he was going to make them [TLA] work this weekend overtime because he wanted to work overtime. I remember him saying that. He made a lot of comments about making them work a whole lot so he could work overtime also." Tr. at 1155.

Testimony was also presented by one of plaintiff's employees, Mr. Siler, who had installed carpeting in the COR's new house after working hours. Tr. at 688–89. He testified that, during the course of this work, the COR "mentioned that we needed overtime, because he needed to make more for his house. He stated that, that we was doing a lot of overtime, and he was saying that he couldn't—we couldn't cut unless he [was] there. We couldn't go overtime unless he was there with us." Tr. at 689.

2. Evidence of Bad Faith of the Other Governmental Agents

■ In order to evaluate the significance of the COR's actions for a determination of whether or not the government acted in bad faith, the court looks to precedents involving contract administration where more than one person acts on behalf of the government. In *Struck Construction Company v. United States*, 96 Ct.Cl. 186, 1942 WL 4411 (1942), the Court of Claims noted that "[i]t is difficult to apply terms with moral implications, such as 'good faith' to impersonal legal entities such as corporations or governments, especially in situations where they act on one matter through a number of agents. Some of the moral qualities may be lost or diluted as the decision passes from one agent to another. But the test of good faith should be the same for an entity that must act through agents as for an individual acting for himself." *Struck*, 96 Ct.Cl. at 221. This court adopts the approach of the *Struck* court and

---

**12.** On cross examination, the government sought to impeach Ms. Reeves' testimony by suggesting through counsel's questions that the COR's house was constructed just prior to the commencement of the TLA contract. However, the court finds Ms. Reeves' testimony about what she heard the COR say regarding overtime to be credible. Her

testimony appeared to the court to be consistent with undisputed testimony that the COR who had just moved into a new house and was continuing to work on its furnishing. *See* Tr. at 689 (testimony of Mr. Siler who performed non-contract work at the COR's house).

applies the following standard: "If the aggregate of the actions of all the agents would, if all done by one individual, fall below the standard of good faith, the entity for whom the various agents acted should be held to have violated that standard. It is the responsibility of the entity, the principal, to so coordinate the work of its agents that the aggregate of their actions will conform to required legal standards." *Struck,* 96 Ct.Cl. at 221.

■ Defendant argues that even if the COR was biased against TLA and acted in bad faith, the termination for default should be upheld because there were other governmental agents who conducted inspections on the contract and found deficiencies in performance. Def.'s Br. at 12–13. Defendant cites two cases to support its argument, *Pride Unlimited, Inc.,* ASBCA No. 17778, 75–2 BCA (CCH) ¶ 11,436, pp. 54,486, 54,500, 1975 WL 1684 (1975), and *William Roach,* PSBCA No. 3335, 97–1 BCA (CCH) ¶ 28,735, pp. 143,409, 143,416 (1996). However, the court finds defendant's authorities inapposite in the circumstances of this case.

The evidence of bad faith in *Pride Unlimited* does not approach the weight of the evidence before this court of the COR's expressions of ill will and intent to injure. In *Pride Unlimited,* the court acknowledged that the inspector was biased against the contractor because of his relationship with the previous contractor but concluded that the inspector was merely insisting on strict compliance with contract provisions. Some similar evidence of bias was presented in this case, but the COR's actions here went further than an expressed preference for another contractor and an insistence on strict contract compliance. Here, the COR threatened to run TLA off the Army base, repeatedly expressed contempt for TLA and TLA personnel, and then expressed pleasure in terminating TLA for default. *See, e.g.,* Tr. at 770, 1039, 1157, 1160. It is the finding of the court, based on the testimony heard at trial, that the COR's actions in this case far exceeded strict insistence on contract compliance. The COR here expressed ill will and intent to injure.

The facts in *William Roach* are also significantly different than the credible evidence presented by TLA at trial. In *William Roach,* the Board was persuaded that the CO acted independently of the inspector who had allegedly acted in bad faith. In this case, several witnesses testified to the close relationship between the COR and the CO.

Ms. Reeves testified that she observed the CO to be present when Ms. Reeves heard the COR disparaging officers of TLA. Tr. at 1160. "I believe she [the CO] was present when he said that that day." Tr. at 1158 (discussing an occasion when the COR used a vulgar epithet to refer to the president of TLA). Ms. Reeves also observed the CO making unprofessional personal comments about officers of TLA. Tr. at 1176 (for example, that the president of TLA is "arrogant" and that the Secretary/Treasurer of TLA is a "pest"). Ms. Reeves also testified that in her capacity as a clerical assistant in the contracting office she answered phones and took messages from the Secretary/Treasurer of TLA, Barbara Price, when she would call to speak to the CO. Tr. at 1158. Ms. Reeves testified that "Barbara Price was calling a lot, she couldn't get through, no one would respond to her. I would take messages for Linda [the CO] that Ms. Price had called and I know that she didn't return her calls because Ms. Price would continue to call, and it put me in an odd position, it made me feel like I wasn't giving her the messages, but I was, and that happened many times." Tr. at 1158. Ms. Reeves recalled that on one occasion officers of TLA were in the waiting area where she was stationed and they wanted to meet with the CO. Tr. at 1158–59. Ms. Reeves testified that at this time the COR and CO were in the CO's office and she heard over the intercom the COR advise the CO not to see TLA's officers. Tr. at 1158–59. Ms. Reeves also testified that after the termination for default she observed the CO to be relieved and glad. Tr. at 1163.

The government presented testimony of the COR in rebuttal and asked, "Did Linda Smith ever direct you to stop referring to yourself as Jesus Christ in connection [with your] duties as a COR?" Tr. at 1350–1351. The COR responded, "I don't know if me and

Linda actually ever talked about it. When it was first brought up about it, something like this, she said, don't make reference, I believe something like that. She's reprimanded me on several words that I used that don't comply with contract administration law the way she sees it or the way its supposed to be done." Tr. at 1351.

On cross examination, the CO testified, "I had heard him [the COR] make that [Jesus Christ] statement and told him I didn't think he should use those words, that was not appropriate." Tr. at 635. The CO testified that she could not recall the meeting in the barn where other witnesses testified that the COR promised to "break" TLA. Tr. at 634. The CO testified that "[i]f I heard any COR make that statement in my presence, they would no longer be a COR, I would rescind their COR appointment that day." Tr. at 635. The CO also testified, "I have taken action on CORs that I felt were, you know, things inappropriate, certainly have." Tr. at 635. The court carefully observed the demeanor of the CO and the COR in response to questions of misconduct and it is the finding of the court that the CO was, at the very least, on notice of the COR's bad faith toward plaintiff. The court also finds that the CO did nothing to remove the COR's influence over the administration of the contract. On the inspections in which the CO participated, she merely accompanied the COR. Tr. at 574. The CO's failure to inquire into and remedy the COR's bad faith coupled with the lack of evidence that the CO exercised independent judgment in applying the standards of the contract results in the court's finding of bad

faith on the part of the government in administering the contract.[13]

The government's reliance on *William Roach* is inappropriate in light of the court's finding that the CO should have been aware of the COR's ill will toward plaintiff and that she neither controlled his behavior nor exercised judgment fully independent of the bias and intent to injure expressed by the COR.

The majority of inspections were conducted by the COR and although he was clearly acting in bad faith, he was never removed from the administration of the contract. On the few occasions where the CO participated in inspections of TLA's performance, she accompanied the COR and discussed the inspections with him. Tr. at 574. After hearing the testimony of the CO and the COR and the other witnesses, it is the finding of the court that the CO did not exercise independent judgment concerning the plaintiff's performance of the contract.[14]

It is the court's finding that the credible testimony given at trial provides adequate "evidence of some specific intent to injure the plaintiff" required by precedent for a finding of bad faith. *See Kalvar*, 543 F.2d at 1302. The COR's demonstrated intent to injure, taken together with the performance of the other governmental actors who dealt with plaintiff on this contract, falls below the standard of good faith that is essential to the integrity of government contracting. *See Struck*, 96 Ct.Cl. at 221.

### D. Arbitrary and Capricious Standard for Termination for Default

The pleadings, evidence and argument in this case also address two contentions of

---

13. It is unclear to the court what effect the COR's bad faith had on the other two inspectors under his command. Clearly these two inspectors rode around the base with the COR and were exposed to his strong opinions of plaintiff. There was testimony that both Inspector McKinzie and the CO were present when the COR promised TLA that he was going to "run TLA off" the Army base. Tr. at 1070. While plaintiff did not establish these inspectors' bad faith or intent to injure plaintiff, neither did defendant establish their independence from the COR's bad faith was sufficient to outweigh its effect on the administration of the contract.

14. The logic inherent in *Struck* governs this court's decision because *Struck's* aggregate ac-

tions standard properly directs the court's attention to the actualities of the treatment of the contractor in this case, in particular, to the likely cumulative impact of bad faith on the government's assessment of TLA's performance. Of course, where a government employee acts in bad faith, it is possible for the government to overcome or purge the effect of the actions of that individual. The government actor could be removed from responsibility related to the activity where he had displayed bad faith and effectively counseled and disciplined. Here, in an apparently notorious case of bad faith, the court finds that the CO did not insulate the plaintiff from or otherwise effectively purge the COR's bad faith.

plaintiff that might support a finding that defendant's actions were arbitrary and capricious. These contentions were claims of overzealous inspections and of hindering by the government of plaintiff's performance, either of which, if proven, might support a finding that the government's termination for default was arbitrary and capricious.

It is well established that if the government engages in overzealous inspections or otherwise acts in a way that will hinder performance, it is a violation of its implied obligations. *See, e.g., SMS Data Prods. Group, Inc. v. United States,* 17 Cl.Ct. 1, 6 (1989); *Malone v. United States,* 849 F.2d 1441, 1445 (Fed.Cir.1988).

The precedents also make clear that the standard of proof for bad faith, a standard plaintiff has met, is higher than the standard for the arbitrary and capricious action of the government. *Darwin Constr. Co. v. United States,* 811 F.2d 593, 598 (Fed.Cir.1987) (citing *Burchell v. Marsh,* 17 How. 344, 349, 15 L.Ed. 96 (1854); *Kihlberg v. United States,* 97 U.S. 398, 14 Ct.Cl. 582, 24 L.Ed. 1106 (1878); *United States v. Gleason,* 175 U.S. 588, 602, 35 Ct.Cl. 625, 20 S.Ct. 228, 44 L.Ed. 284 (1900)). *See Udis v. United States,* 7 Cl.Ct. 379, 387 (1985).

The government's reliance on the authority of *International Verbatim Reporters, Inc. v. United States,* 9 Cl.Ct. 710 (1986) to avoid liability here is misplaced. While that case upheld a termination for default despite the court's finding that the government exaggerated contractor errors and nitpicked inspections because the contractor had failed to render substantial performance, there was no finding, as there is here, of intent to injure.

In view of the court's finding of bad faith on the part of the government, it is difficult—if not impossible—to assess whether the administration of the contract and the resulting termination for default was arbitrary and capricious because the evidence of

default itself is tainted by bad faith. The court notes that some credible evidence of overzealous inspection and hindrance of TLA's performance was offered at trial. Because of the finding of bad faith in fact in the administration of the contract, the court need not attempt to parse out the effects of bad faith on the contractor's performance or on the methods and result of the various inspections. The plaintiff has already carried its burden of establishing bad faith.

III. Conclusion

It is the finding of the court that the government acted in bad faith in the administration of plaintiff's contract, resulting in an improper termination for default.[15] The government's termination of TLA for default shall be converted into a termination for convenience effective as of the date of the erroneous termination for default, August 8, 1992. TLA shall have up to and including September 15, 2000 within which to submit its settlement proposal in accordance with the FAR.[16] The case is remanded to the contracting officer for a determination of amounts owed to plaintiff. The case shall be stayed pending the contracting officer's determination. The parties shall file a joint status report with the court on or before November 15, 2000.

IT IS SO ORDERED.

---

**15.** The court has carefully considered all arguments advanced by the parties and not fully discussed in this opinion and has found them to be either without legal merit or not supported by the evidence.

**16.** *See Reflectone, Inc. v. Dalton,* 60 F.3d 1572 (Fed.Cir.1995) (en banc); *James M. Ellett Constr.*

*Co. v. United States,* 93 F.3d 1537 (Fed.Cir.1996). *See also Advanced Materials, Inc. v. United States,* 46 Fed.Cl. 697 (2000) (overview of authorities on requirements for a termination settlement proposal in event of a termination for convenience).