### MANSON CONSTRUCTION CO., Plaintiff,

v.

### The UNITED STATES, Defendant,

### B + B Dredging Co., Intervening–Defendant.

### No. 04–1783 C.

United States Court of Federal Claims.

Filed under seal: Feb. 14, 2005.

Reissued: March 14, 2005.[1]

---

1. An unredacted version of this opinion was issued under seal on February 14, 2005. The parties were given an opportunity to propose redactions, but no such proposals were made. Accordingly, the opinion is issued in its original form, with minor corrections.

Michael H. Payne, Starfield & Payne, P.C., Ft. Washington, Pennsylvania, for plaintiff.

Steven M. Mager, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General Peter D. Keisler, for defendant.

Lars E. Anderson, Venable, LLP, Vienna, Virginia, for intervening-defendant, B + B Dredging Company.

## OPINION

ALLEGRA, Judge.

This is a post-award bid protest action. On February 9, 2005, the court conducted oral argument on the parties' cross-motions for judgment on the administrative record. Having previously reviewed the briefs, administrative record and relevant authorities, the court, at the conclusion of the oral argument, denied plaintiff's motion for judgment on the administrative record and granted defendant's cross-motion. At that time, the court provided a short oral explanation of its ruling, promising to provide, within several days, a more complete explanation of its *ratio decidendi* in this opinion.

## I. FACTUAL BACKGROUND

Briefly, based upon the administrative record, the facts herein are as follows:

This case involves a contract for dredging the Mobile Harbor Channel. Regarding such contracts, 33 U.S.C. § 622 (2000) authorizes the Army Corps of Engineers (the Corps) to have "dredging and related work

748

done by private contract if ... private industry has the capability to do such work and it can be done at reasonable prices and in a timely manner." However, 33 U.S.C. § 624(a)(2) (2000) limits this authority, by indicating that dredging work cannot be done by private contract "where the Secretary of the Army, acting through the Chief of Engineers, determines that the contract price is more than 25 per centum in excess of what he determines to be a fair and reasonable estimated cost of a well-equipped contractor doing the work."

On August 16, 2004, the Corps issued solicitation No. W91278–04–B–0012, for "the removal and satisfactory disposal of material above—52 feet" in navigation channels along the Gulf Coast of Mississippi, Alabama, and Northwest Florida. The solicitation incorporated several standard Federal Acquisition Regulations (FAR) clauses, among them FAR 52.214–19, which provides–

> Government will evaluate bids in response to this solicitation without discussions and will award a contract to the responsible bidder whose bid, conforming to the solicitation, will be most advantageous to the Government, considering only price and the price-related factors specified elsewhere in the solicitation.

48 C.F.R. § 52.214–19 (2004). Also incorporated into the solicitation was FAR 52.219–4, which deals with the preference for so-called HUBZone Small Business concerns under the HUBZone program maintained by the Small Business Administration.[2] The latter clause provides, in pertinent part–

> (1) Offers will be evaluated by adding a factor of 10 percent to the price of all offers, except—(i) Offers from HUBZone small business concerns that have not waived the evaluation preference ...."

48 C.F.R. § 52–219–4(b)(1), (b)(1)(i). It further states that "[t]he factor of 10 percent shall be applied on a line item basis or to any group of items on which award may be made. Other evaluation factors described in the solicitation shall be applied before application of the factor." FAR 52–219–4(b)(2).

Bids on the contract were due on September 29, 2004. On that date, the Corps estimated the price of the contract as $4,998,992, incorporating therein a projected diesel fuel price of $0.98 per gallon. This estimate was not provided to potential bidders. On or around September 29, 2004, the bids were opened, revealing the following base prices for the respective bidders:

| Bidder | Base Price |
| --- | --- |
| Manson Construction | $6,153,412.00 |
| B + B Dredging | $6,398,796.40 |
| Weeks Marine | $8,964,560.00 |
| Great Lakes | $9,785,716.00 |

One of these bidders, B + B Dredging Company (B + B Dredging), is a qualified HUBZone Small Business and thus eligible for the evaluation preference described in FAR 52.219–4. However, the only bidder whose bid fell below 125 percent of the Corps estimate, so as to meet the threshold requirements of section 624, was the plaintiff in this action, Manson Construction Company.

According to a memorandum written by the contracting officer after the bids were opened, the contracting officer "noticed a large discrepancy between the [initial government estimate] and the four bids, which resulted in a telephonic request that the Cost Engineering Branch of the Mobile District who prepared the [estimate], review the estimate for reasonableness, adequacy and accuracy." This memorandum, as well as another prepared by the Cost Engineering Branch of the Mobile District, suggest that a second reason for this review may have been because B + B Dredging's bid was outside the range specified by section 624 and because the prices of all the other bidders, including plaintiff, would be outside that range were the 10 percent HubZone evaluation factor added thereto. As reflected in an October 27, 2004, memorandum, the Cost Engineering Branch's review of the estimate revealed a "fuel price discrepancy"—in short, a finding that the price for diesel used in the original estimate of $0.98 per gallon was too

2. The Historically Underutilized Business Zone ("HUBZone") program encourages economic development in historically depressed areas by targeting the award of some Federal government contracts to those areas. *See* 15 U.S.C. § 657(a)(b)(2) (2000).

low and did not reflect the market, which, as of September 29, 2004, was charging an average of $1.45 per gallon. Because the cost of diesel was an important cost center for the contract, this single revision increased the Corp's estimate of the cost of the contract from $4,998,392.00 to $5,951,076.00.

Under this new estimate, both plaintiff's and B + B Dredging company's bids were within the 25 percent range established by section 624. After applying the ten percent HUBZone preference, B + B Dredging was the low bidder and, on November 2, 2004, the Corps awarded it the dredging contract. The next day, November 3, 2004, plaintiff filed a protest with the General Accountability Office (GAO). On December 20, 2004, plaintiff voluntarily withdrew its protest and instead filed a complaint in this court, seeking injunctive relief. The Corps has agreed to stay voluntarily implementation of the contract until February 11, 2005, with the latter date giving rise to the need for expedited consideration of the pending motions.

## II.  DISCUSSION

We begin with common ground. In a bid protest case, this court will enjoin the government only where an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (2000); *see also* 28 U.S.C. § 1491(b)(4) (2000). By its very definition, this standard recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *see Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl. 533, 538 (2003); *Gulf Group, Inc. v. United States*, 56 Fed.Cl. 391, 396 (2003). This court will interfere with the government procurement process " 'only in extremely limited circumstances.' " *C.A.C.I., Inc.-Federal v. United States*, 719 F.2d 1567, 1581 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co., Inc.*, 702 F.2d 1362, 1372 (Fed.Cir.1983)).

It is the burden of the aggrieved bidder to demonstrate that the challenged agency decision is either irrational or involved a clear violation of applicable statutes and regulations. *Banknote Corp. of America, Inc. v. United States*, 365 F.3d 1345, 1351 (Fed.Cir.2004), *aff'g*, 56 Fed.Cl. 377, 380 (2003).[3] Further, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data General Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir.1996). To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.' " *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir.1996)). Finally, because injunctive relief is so drastic in nature, a plaintiff must demonstrate that its right to such relief is clear. *See Banknote Corp. of America, Inc.*, 56 Fed.Cl. at 380–81; *Seattle Sec. Servs., Inc.*, 45 Fed.Cl. at 566; *cf. Beta*

---

**3.** In *Banknote*, the Federal Circuit expounded upon these principles, as follows:

Under the APA standard as applied in ... ADRA cases, "a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation of procedure." [*Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001)]. When a challenge is brought on the first ground, the test is "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision had no rational basis." *Id.* at 1332–33

(citations omitted). "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333. To establish prejudice under this second ground, a protester must show that there was a "substantial chance" it would have received the contract award absent the alleged error. *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed.Cir.2001); *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999).

*Banknote Corp.*, 365 F.3d at 1351; *see also Seattle Sec. Servs., Inc. v. United States*, 45 Fed.Cl. 560, 566 (2000); *Analytical & Research Tech., Inc. v. United States*, 39 Fed.Cl. 34, 42 (1997).

*Analytics Int'l., Inc. v. United States,* 44 Fed.Cl. 131, 137 n. 10 (1999).

In the case *sub judice,* plaintiff asserts that the Corps acted in an arbitrary and capricious fashion, as well as contrary to law, in conducting a review of its initial estimate of the cost for completing the contract. It asserts that the Corps instead should have determined whether plaintiff's bid price was reasonable based upon the initial estimate and, if so, awarded the contract to plaintiff— the only bidder whose bid fell within 25 percent of the original estimate. Defendant and the intervenor asseverate that no provision of law requires this approach and that the Corps did not act in an arbitrary and capricious fashion in conducting the review of its estimate or subsequently modifying it. In the court's view, defendant and the intervenor clearly are correct.

■ Plaintiff is unable to cite any statutory or regulatory provision that required the Corps to award it the contract when its bid was the only one within the 25–percent range established by section 624. While the latter statute effectively prevents the Corps from awarding a contract to a bidder whose bid falls outside the prescribed 25–percent range, it does not require the Corps to award a contract to the low bidder whose bid falls within that range. Indeed, even if that section were contorted to reach the latter result, nothing therein even arguably would prevent

the Corps from reevaluating its estimate to determine whether it was "fair and reasonable" as originally conceived or instead required modification.[4] Reflecting this reading of the statute, the Corps' internal guidance emphasizes the importance of updating estimates, stating that, "[p]rior to award, the Government estimate may be changed or revised as a result of errors, differing conditions, or additional information." United States Army Corps of Engineers, Engineering Instructions 01D010, Construction Cost Estimate § 4–6 (Sept. 1, 1997) ("Requirements for Revision to Government Estimate for Bidding"). Nor is this court willing to accept plaintiff's blithe invitation to snatch from the ether a requirement that an agency must award a contract based upon an original estimate, no matter how much it suspects that estimate is erroneous. Frankly, there is basis neither in law nor reason for such a requirement so detached from realities of the marketplace, which effectively would exempt dredging contracts from price reasonableness considerations applicable to all other construction contracts under FAR 14.404–1(c)(6)—a result entirely at odds with the legislative intent underlying section 624.[5]

Plaintiff cites *Bean Dredging Corp. v. United States,* 19 Cl.Ct. 561 (1990) in support of its claim that under section 624, the Corps was mandated to award it, the low responsive bidder, the contract. In *Bean,* the low bid-

---

4. At oral argument, plaintiff's counsel admitted that, to determine whether plaintiff's bid price was "reasonable," the Corps would need to refer to its cost estimate. *See Overstreet Elec. Co., Inc. v. United States,* 47 Fed.Cl. 728, 732 (2000) (cost estimate used for determining price reasonableness, citing numerous cases); John Cibinic, Jr. & Ralph C. Nash, Jr., Formation of Government Contracts 1317 (3d ed.1998) (same). The court sees nothing in any statute or regulation that would prevent the Corps from reexamining its estimate to ensure its accuracy before making that reasonableness determination. *Id.* at 1318 ("Since government estimates are made early in the procurement process, it may be necessary to update them for use in the price analysis.").

5. 48 C.F.R. § 14.404–1(c)(6) (2004) indicates that an invitation may be cancelled and all bids rejected before award if it is determined that "[a]ll otherwise acceptable bids received are at unreasonable prices." *See Overstreet,* 47 Fed.Cl. at 732. Plaintiff contends that it is not seeking to

circumvent this reasonableness inquiry, but rather to enforce it by compelling the Corps to make such a determination as to its bid—but, with a catch, as plaintiff would require this inquiry to be based upon the Corps' initial estimate, even if that figure no longer provided any assurance of price reasonableness. Moreover, it bears noting that plaintiff's bid price was still 23 percent higher than the original estimate, making it likely that had the Corps conducted the review plaintiff requests it would have found plaintiff's price unreasonable and likely would have cancelled the solicitation. *See, e.g., J. Morris & Assocs, Inc.,* 94–2 C.P.D. ¶ 47, 1994 WL 396414 (Comp. Gen.1994) (finding cancellation justified where the low responsive bid exceeded the government estimate by 23 percent and indicating that such cancellations had been upheld by GAO based upon differentials as low as 10 percent); *see also Caddell Constr. Co. v. United States,* 7 Cl.Ct. 236, 241 (1985). In such a circumstance, the agency would have resolicited the contract using a new estimate.

der demonstrated that the Corps estimate was unreasonably low and that its responsive bid did not exceed the corrected estimate by more than 25 percent. By way of relief, the court not only set aside the cancellation of the solicitation, but also enjoined the Corps from awarding the contract to anyone but Bean. *Id.* at 585. It granted the latter relief, however, without a single word of explanation. Subsequently, two GAO cases convincingly demonstrated that the relief granted in *Bean* was erroneous. In the first of these, *Atkinson Dredging Co., Inc.,* 93–2 C.P.D. ¶ 31, 1993 WL 274310 (Comp.Gen.1993), the GAO made short shrift of a claim similar to that made by plaintiff here, explaining–

> While the court [in *Bean* ] conducted an exhaustive examination of the government estimate and the challenge to it, it seems to have assumed that the low bidder was entitled to the award once its bid came within 25 percent of the estimate. There is no analysis supporting the court's conclusion, nor is there a citation to any other decision reaching that result. In our view, the court's interpretation—which would infringe upon the agency's ability to exercise its discretion in the determination of price reasonableness, see Federal Acquisition Regulation 14.407–3—is not consistent with the plain language of the statute, which limits only the agency's ability to award contracts where all the bids received exceed the government estimate.... We therefore decline to follow it.

*Id.* at *2 (citations omitted). Later, in *Overstreet Electric Co., Inc.,* 2000 C.P.D. ¶ 79, 2000 WL 621308 (Comp.Gen.2000), the GAO reaffirmed its ruling in *Atkinson* and, corre-

spondingly, its rejection of *Bean.* Augmenting its prior analysis, it specifically discounted the claim that the legislative history of section 624 required a different result, stating "[t]his legislative history in no way contradicts the plain meaning of the statute, which only requires the rejection of bids if they exceed the government estimate by more than 25 percent and does not in any way limit an agency's ability to determine that a price is unreasonable, even if it is within 25 percent of the government estimate." *Id.* at *2 (citing S.Rep. No. 95–722, at 3 (1978)). Having reviewed the relevant statutes and underlying legislative history, the court believes that the analysis in these cases is correct.

■ The question then becomes whether the Corps acted in an arbitrary and capricious fashion in conducting the reevaluation of its estimate. In past dredging cases, this court has observed that "the government will, by necessity, have a variety of estimates for a project," noting that "[t]hese estimates will differ according to the purpose of the estimate and the time at which it is made." *Delbert Wheeler Const., Inc. v. United States,* 39 Fed.Cl. 239, 250 (1997), *aff'd,* 155 F.3d 566 (Fed.Cir.1998) (table) (*citing* Dept. of the Army, U.S. Corps of Engineers, Engineering and Design, Civil Works Cost Engineering, Regulation No. 1110–2–1302 (March 1994)). More generally, the GAO and the Boards have ruled that agencies have broad discretion in deciding whether to reevaluate an estimate and may conduct such reviews where, for example, the differential between the bids and the estimate, or even among the bids, is perceived as great.[6] In particular,

6. *See, e.g., Birch & Davis Int'l, Inc. v. Dept. of State,* 92–2 B.C.A. ¶ 24,881, 1992 WL 45953 (1992), *vacated on other grounds,* 4 F.3d 970 (Fed.Cir.1993) (revision upheld where prompted by price differential between estimate and bids); *RNJ Interstate Corp.,* 91–1 C.P.D. ¶ 219, 1991 WL 73065, *2 (Comp.Gen.1991) (upward revision upheld where prompted by the fact the lowest bid received was $1 million higher than the original estimate); *Adam Electric Co., Inc.,* 82–2 C.P.D. ¶ 576, 1982 WL 35826 (Comp.Gen.1982) (review of original estimate upheld where prompted by bids below the original estimate); *Arlandria Const. Co.,* 80–2 C.P.D. ¶ 21, 1980 WL 16317, *2 (Comp.Gen.1980) (agency could revise its estimate after the bids had been opened, and after three previous canceled solicitations, where bids

remained much higher than the government estimate); *Breman Enterprises, Inc.,* 80–2 B.C.A. ¶ 14,755, 1980 WL 2465 (1980) ("the existence of a wide range between the low bid price and the other bid prices is sufficient to charge the contracting officer with notice of probable error" of the low bid and of the original estimate); *Ureco Constr. Inc. and American Timber Co.,* 79–2 C.P.D. ¶ 335, 1979 WL 11843, *3 (Comp.Gen. 1979) (government "acted reasonably" when a review of errors in a bid prompted it to review its own estimate and revise to reflect all costs). Although decisions of the GAO are not binding on this court, they can be used for guidance when they are found to be reasonable and persuasive. *Overstreet,* 47 Fed.Cl. at 733 n. 7;

the GAO has found that an agency properly revised its estimate, even where, as here, it had a responsive bid that might otherwise have resulted in the award of the contract. In *Adam Electric Company,* 1982 WL 35826 at * 2, for example, it concluded that "the downward revision of the estimate [was] a reasonable exercise of discretion by the contracting officer," even though the result was that a responsive bid that had been lower than the estimate was not awarded the contract.[7]

GAO decisions also readily establish that an agency enjoys a wide latitude in actually revising its estimate where costs either were not properly calculated *ab initio* or where circumstances impacting the estimate simply changed over time. As explained in *TAMS/Flour Daniel,* 1993 WL 56759, at *3:

> [Initial Government Estimates (IGE) ] are, by their nature, inexact and agencies may change them after the receipt of bids or proposals where a review of the bids or proposals shows that the initial IGE was incorrect in its assessment of the level-of-effort necessary to perform the requirement or in its prediction of fair and reasonable prices as [compared] to the actual pricing disclosed by competition.

*See also, e.g., Mar–Mac Precision Corp.,* 84–2 C.P.D. ¶ 164, 1984 WL 46462, *3 (Comp. Gen.1984) (upward revision upheld where the contracting officer, in consultation with an industry specialist, realized that he had undervalued the cost of brackets); *Leo Journa-*

*gan Const. Co., Inc.,* 79–1 C.P.D. ¶ 59, 1979 WL 12983, *2 (Comp.Gen.1979) (upward revision upheld where prompted by realization that the costs of the project had been undervalued); *McCarthy Mfg. Co.,* 56 Comp. Gen. 369, 1977 WL 10363, *3 (1977) (downward revision upheld where the agency found "that the original estimate was outdated and excessively high"). In theory, such revisions in no way constitute an affront to the integrity of the bidding process, particularly where, as here, the estimates were not revealed to the bidders in advance of bidding and did not result in any bid being altered or discarded.[8] In practice, the question is whether the alteration is arbitrary and capricious. *See Delbert Wheeler Const., Inc.,* 39 Fed.Cl. at 250; *see also Columbus Building & Supply Co.,* 77–2 C.P.D. ¶ 70, 1977 WL 12312, *4 (Comp. Gen.1977); *McCarthy Mfg. Co.,* 1977 WL 10363 at *3.

These principles, as applied to the facts *sub judice,* provide no basis for concluding that the Corps acted in an arbitrary or capricious fashion either in deciding to reexamine its estimate or in actually modifying the estimate to reflect changes in diesel fuel costs. First, the court cannot say that the Corps in an arbitrary and capricious fashion in concluding that the broad dispersion of the bid prices here, as well as the fact that the lowest bid was more than 23 percent higher than the original estimate, suggested that a review of the original estimate for continued accuracy was appropriate. Nor, in the court's view, did the agency act arbitrarily in also considering the possibility that an undu-

---

*C.A.C.I. Field Servs. v. United States,* 13 Cl.Ct. 718, 731 n. 28 (1987), *aff'd,* 854 F.2d 464 (Fed. Cir.1988).

**7.** *See also TAMS/Flour Daniel,* 93–1 C.P.D. ¶ 199, 1993 WL 56759, *3 (Comp.Gen.1993) (revision of initial estimate triggered by review of offers upheld, even though protester's offer was "more in line with the original estimate"); Cibinic & Nash, *supra* at 1318.

**8.** In *Columbus Bldg. & Supply Co.,* 77–2 C.P.D. ¶ 70, 1977 WL 12312 (Comp.Gen.1977), the protester argued that once it noticed an error in the estimate, the agency should have cancelled the solicitation instead of revising the estimate and awarding the contract to the lowest bidder. *Id.* at *1. The Comptroller General rejected that argument, distinguishing between cases where there is a revision to the specifications in the

solicitation and when the change is to a government estimate that is used for internal purposes. *Id.* at *4. It explained:

> Here, the government estimate was used for internal purposes and was not revealed to bidders until after the bid opening. The fact that this estimate was determined to be erroneous after bid opening did not cause bidders to be misled or otherwise affect the bidding. The government's estimate was in error and not the requirements under the IFB.

*Id.* The threat to competition here simply is not the same as that presented by the cancellation of a solicitation after the bids are made public. *Cf. Cal. Marine Cleaning, Inc. v. United States,* 42 Fed.Cl. 281, 292 (1998) ("To have a set of bids discarded after they are opened and each bidder has learned his competitor's price is a serious matter, and it should not be permitted except for cogent reasons.").

ly low estimate might have the effect of improperly depriving the only HubZone contractor here, B + B Dredging, from an award because, under section 624, the latter's bid was more than 25 percent higher than the original estimate.[9] Second, based upon the available statistics on diesel prices, the court cannot say that the Corps acted in an arbitrary and capricious fashion in increasing its estimate of the price of diesel fuel, which, as noted, was a key component in the overall pricing of this contract.[10]

On all these points, plaintiff offers little more than mere disagreements with the Corps' assessments. "Such naked claims," this court has stated, "by all appearances unsupported by anything in the record, fall far short of meeting the heavy burden of demonstrating that these findings were the product of an irrational process and hence arbitrary and capricious." *JWK Int'l Corp. v. United States*, 52 Fed.Cl. 650, 660 (2002), *aff'd*, 56 Fed.Appx. 474 (Fed.Cir.2003) (table); *see also Banknote Corp.*, 56 Fed.Cl. at 384. Nor does plaintiff allege—let alone show—that, in deciding to review and modify the estimate, the Corps' officials were acting

in "bad faith," actuated by animus and with a specific intent to harm plaintiff.[11]

In sum, plaintiff essentially argues that the Corps, like Old Dobbins, should have donned blinders and stuck to its original estimate even when suspicions regarding its accuracy were aroused. Perhaps, there are occasions where the procurement law, for fairness reasons, reins in the ability of an agency to react to changing circumstances, particularly in the case of sealed bids. This is not one—there are no provisions of law limiting the ability of the Corps to reexamine its estimate in light of current market conditions and revise that figure as reasonable observations warrant. Plaintiff is left to argue that the Corps' actions were arbitrary and capricious—and the simple fact is they were not. Indeed, although the court does not reach this issue, it is far more likely that had the Corps *failed* to act here and been challenged, its *inaction* would have been deemed arbitrary and capricious.

## III. CONCLUSION

This court need go no further. Measured by the appropriate standard of review, the

---

9. Plaintiff highlights statements made by Corps officials concerning the application of the HUBZone preference, one of which stated that "[a]fter applying the 10 percent HUBZone evaluation factor to all large businesses, it was noted that all bids were more than 25 percent above the Independent Government Estimate ...." It asserts that it was arbitrary and capricious for the Corps to base its reexamination of the initial estimate on this analysis because, in plaintiff's view, the 25 percent rule of section 624 should be applied to the actual prices bid, not taking into account the HUBZone evaluation factor. While the court generally agrees that section 624 should be applied to the base price that the Corps will actually pay, that does not alter the fact that, as documented by the contracting officer, the reason the Corps requested the review of the estimate here was because of "a large discrepancy between the IGE and the four bids." Moreover, the court believes that the Corps' discussion of the HUBZone evaluation factor evinces a basic concern that the HUBZone contractor not be improperly excluded from the award, a concern that, in the court's view, provides an independent, adequate basis for conducting a review of the original estimate for reasonableness and accuracy.

10. While plaintiff complains that the Corps relied upon "spot prices" for diesel fuel, it has again provided no indication whatsoever that the use of such prices was irrational or even inflated the

Corps new estimate. Indeed, it bears mention that while the Corps adjusted its fuel price estimate from $0.98 per gallon to $1.45 per gallon, a much smaller increase would still have raised the overall estimate enough to result in an award of the contract to B + B Dredging.

11. It is well settled that government officials are presumed to act conscientiously and in good faith in the discharge of their duties. *See, e.g., Spezzaferro v. Federal Aviation Admin.*, 807 F.2d 169, 173 (Fed.Cir.1986); *Asco–Falcon II Shipping Co. v. United States*, 32 Fed.Cl. 595, 604 (1994); *Kalvar Corp., Inc. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298, 1301–02 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977). In order to overcome this presumption, a plaintiff "must allege and prove, by clear and strong evidence, specific acts of bad faith on the part of the government." *Asco–Falcon*, 32 Fed. Cl. at 604. The level of proof to overcome this presumption is high, often described as requiring "well nigh irrefragable proof." *Kalvar*, 543 F.2d at 1301–02. While this standard is not intended to "insulate government action from any review by courts," *Libertatia Assoc., Inc. v. United States*, 46 Fed.Cl. 702, 707 (2000), according to the Federal Circuit, it has "been equated with evidence of some specific intent to injure the plaintiff." *Kalvar*, 543 F.2d at 1302.

**754**

Corps' conduct here was not erroneous. As plaintiff has not succeeded on the merits, it obviously is not entitled to the injunctive relief it requests.

In consideration of the above, **IT IS ORDERED:**

1. Plaintiff's motion for judgment on the administrative record is **DENIED** and defendant's cross-motion for judgment on the administrative record is **GRANTED**.

2. This opinion shall be unsealed as issued after March 10, 2005, unless the parties identify protected and/or privileged materials subject to redaction prior to said date. Said materials shall be identified with specificity, both in terms of the language to be redacted and the reasons for that redaction.